United States District Court
Southern District of Texas
**ENTERED**
September 20, 2019
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DANTE GORDON, individually and on § 
behalf of all others similarly situated, §
                                       §
            Plaintiff,                 §
                                       §
VS.                                    §        CIVIL ACTION NO. H-19-585
                                       §
SIG SAUER, INC.,                       §
                                       §
            Defendant.                 §

**MEMORANDUM AND OPINION**

Sig Sauer, Inc. designs and manufactures pistols for military, law enforcement, and civilian use.  One pistol model, manufactured from 2014 to 2017, the P320, could allegedly "drop fire"— discharge a round of ammunition if dropped to the floor—a design defect.  Dante Gordon alleges that he purchased his P320 in 2014.  Gordon does not allege that his P320 fired after being dropped. Instead, Gordon alleges that he would not have purchased the P320, or would have paid less, if he knew that it was not "drop safe"; that he has stopped using his P320; and that his P320 has lost resale value.

Although Gordon alleges that Sig Sauer learned of the problem in internal testing before launching the P320 in 2014, he also alleges that in 2016, the United States Army notified Sig Sauer of the potential to drop-fire.  In 2017, Sig Sauer implemented a Voluntary Upgrade Program that made modifications designed to address drop performance, without charging customers.  Under the Program, customers had to send in their P320s to have the drop-fire issue fixed. Gordon has not sent in his P320.  Sig Sauer changed the design for pistols made in 2017 and after.  (Docket Entry No. 1).

Sig Sauer moved to dismiss.  Gordon amended his original complaint, asserting claims for express and implied warranty breach, unjust enrichment, fraudulent concealment, fraud, and violations of the Magnuson-Moss Warranty Act and the Texas Deceptive Trade Practices Act.  Sig Sauer answered and moved to dismiss for lack of subject-matter and personal jurisdiction and for failure to state a plausible claim.  Gordon argues that he has alleged facts sufficient for standing, and that the amended complaint allegations state plausible claims under the Magnuson-Moss Warranty Act and Texas law.  Gordon sued on behalf of both himself and a nationwide class of P320 purchasers; Sig Sauer moved to strike Gordon's proposed class definitions or to narrow them to Texas purchasers.  Gordon responded that it is premature to address the class definitions or personal jurisdiction as to putative class members.

After carefully reviewing the amended complaint; the motion to dismiss, response, and reply; the properly considered documents; and the applicable law, the court grants in part and denies in part the motion to dismiss, and grants the motion to strike.  (Docket Entry No. 35).  Gordon must amend his complaint to conform to these rulings no later than **October 28, 2019**.

The motions to dismiss for lack of subject-matter jurisdiction and lack of personal jurisdiction are denied.  (Docket Entry  No. 35).  Sig Sauer's Rule 12(b)(6) motion to dismiss is granted in part and denied in part.  The court grants the motion to dismiss for insufficient pleading as to:

- the claim for written warranty breach under the Magnuson-Moss Warranty Act, without prejudice and with leave to amend;

- the express warranty claim under Texas law, without prejudice and with leave to amend;

- the fraudulent concealment claim, with prejudice and without leave to amend;

- the fraud by misrepresentation and concealment claims, without prejudice and with leave to amend;

- the Texas Deceptive Trade Practices Act claim for false, misleading, or deceptive statements, without prejudice and with leave to amend.

The court denies Sig Sauer's motion to dismiss as to:

- the implied warranty claims under the Magnuson-Moss Warranty Act and Texas law;

- the unjust enrichment claim; and

- the Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct.

The motion to strike the class definitions is granted, as follows:

- the common-law fraud claims and the Texas Deceptive Trade Practices Act claims based on false and misleading statements are stricken as to both the putative Texas and nationwide classes; and

- the express and implied warranty claims, Magnuson-Moss Warranty Act claims based on the Texas-law warranty breach claims, the Texas Deceptive Trade Practices Act claims based on warranty breach, and the unjust enrichment claims are stricken as to the putative nationwide class.

As to Gordon, individually, the implied warranty breach claim, the Magnuson-Moss Warranty Act claim based on implied warranty, the unjust enrichment claim, and the Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct remain pending. As to the putative Texas class, the implied warranty breach claim, the Magnuson-Moss Warranty Act claim based on implied warranty, the unjust enrichment claim, and the Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct remain pending. As to the nationwide class, only the Texas Deceptive Trade Practices Act claim based on unconscionable conduct remains pending.

The reasons for these rulings are stated in detail below.

## I.      Background

### A.      The Amended Complaint Allegations

The facts are drawn from Gordon's amended complaint allegations, accepted as true for this motion, and the documents referred in and central to those allegations. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

Sig Sauer, a Delaware corporation with its principal place of business in Portsmouth, New Hampshire, designs and manufactures "firearms for military, law enforcement, and commercial markets," including "pistols, rifles, short barrel rifles, [and] accessories." (Docket Entry No. 34 at 4). The firearms are marketed and sold by licensed dealers. (*Id.*). In 2014, Sig Sauer began manufacturing the P320, a handgun with "a striker firing mechanism." (*Id.* at 1–2).

That year, Dante Gordon bought a P320 "from an ARS Outdoors store in Cypress, Texas." (*Id.* at 3). Before buying the pistol, Gordon "reviewed the portion of the [Sig Sauer] website concerning the P320"; "relied on [Sig Sauer's] marketing statements about the safety of the firearm"; and "understood" the "accompanying labels, disclosures, warranties, and marketing materials . . . as representations and warranties . . . that the P320 was properly designed, was 'drop safe[,]' and 'won't fire unless you want it to.'" (*Id.*).

Gordon alleges that Sig Sauer's "Safety Without Compromise marketing campaign" included the statement that "[f]rom the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to." (*Id.* at 5 (internal quotation marks omitted)). He alleges that advertisements associated with the marketing campaign stated that the P320 would fire only after a trigger pull and was "drop safe." (*Id.* at 5–6). Gordon does not allege in what years or months this marketing campaign began or ended, or what statements he read and relied on when he bought

4

his P320.  (*See id.* at 3–6).  Instead, he alleges that he "understood" what he saw on Sig Sauer's marketing materials and website as stating that the P320 was "drop safe."  (*Id.* at 3).

The P320 Owner's Manual warned that "[i]f dropped, the pistol may fire," and that "[a]ny firearm may fire if dropped."  (Docket Entry No. 36 at 3 (emphasis omitted)).  It is unclear whether Gordon saw the Manual before making his P320 purchase.  Gordon alleges that the P320 became a "popular and commercially successful pistol" used "by law enforcement agencies all over the country" and owned "by hundreds of thousands of civilians."  (Docket Entry No. 34 at 1).  In 2015, the United States Army contracted with Sig Sauer to manufacture the P320 for military use.  (*Id.* at 2, 6).

Gordon alleges that the P320 model manufactured between 2014 and August 2017 had a design defect allowing it to "inadvertently" fire if dropped with a round in the chamber.  (*Id.* at 1–2, 8).  Because of unspecified "internal testing," Gordon alleges, Sig Sauer has known of the "defect since at least 2014."  (*Id.* at 2).

In April 2016, after the Army "discovered that the SIG P320 pistol [model manufactured starting in 2014] would fire unintentionally" when dropped, the Army informed Sig Sauer, which promptly "modified the trigger mechanism" to fix the issue.  (*Id.* at 6–7).  Gordon alleges that this initial modification "only applied to military versions of the SIG P320."  (*Id.*).  Sig Sauer did not "implement the drop fire fix for its civilian pistols until [August] 2017, at which point it began manufacturing the P320 with a lighter trigger and modified sear."  (*Id.* at 7–8).  Gordon alleges that gun owners, law enforcement, and firearm dealers "replicated the drop fire incidents in their own testing" of pistols manufactured before 2017.  (*Id.*).

Gordon alleges that, on August 4, 2017, Sig Sauer's Chief Executive Officer, Ron Cohen, released a statement that "[t]here have been zero (0) reported drop-related P320 incidents in the

U.S. Commercial market." (*Id.* at 11).  Days later, on August 8, 2017, Sig Sauer "announced a 'voluntary upgrade' for the P320 pistol," inviting P320 owners to send in their guns to enhance "overall safety including drop performance" by reducing trigger, sear, and striker weight.  (*Id.* at 11, 14).  Sig Sauer did not issue a mandatory recall.  Instead, "[t]he voluntary upgrade was presented as purely optional, not urgent, and not mandatory."  (*Id.* at 11).

Sig Sauer did not send individual notice to P320 owners of the Voluntary Upgrade Program to address the drop-fire problem.  (*Id.* at 13).  Instead, Sig Sauer posted information about the upgrade on its website.  (*Id.* at 14–18).  Gordon alleges that "[t]he only information about the drop fire design first appeared around August 8, 2017, [and] is buried in the Frequently Asked Questions [section] in [Sig Sauer's] website."  (*Id.* at 16).  That section describes why Sig Sauer offered the Voluntary Upgrade Program:

> Through additional testing above and beyond standard American National Standards Institute (ANSI)/Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), Department of Justice (DOJ), Massachusetts, California, and other global military and law enforcement protocols, we have confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped.  Although it is a rare occurrence, with very specific conditions, SIG SAUER is offering an upgrade to all of its current P320 owners.

(*Id.*).  The Frequently Asked Questions section of the website also stated that, even as originally designed, the P320 "meets and exceeds all US safety standards" and "exceeds all ANSI/SAAMI, NIJ, DOJ, California, Massachusetts, and safety standards."  (*Id.* at 17).  The section also stated that "[m]inimal reported drop-related P320 incidents have occurred in the US commercial and law enforcement markets, with hundreds of thousands of guns delivered to date," and that the reported incidents "occurred in conditions that appear to be outside of normal testing protocols."  (*Id.*).

Gordon alleges that "more than 500,000 SIG P320 pistols were sold to the public with the design defect."  (*Id.* at 8).  Gordon identified four individuals injured when their P320s fired when

dropped; these individuals allegedly reported the incidents to Sig Sauer as early as January 2017. (*Id.* at 9–10).

### B.     The Claims for Relief and Motions to Dismiss and Strike

The amended complaint alleges that Sig Sauer defectively designed the P320, and that it misrepresented and warrantied that "the P320 pistols were 'drop safe' and 'won't fire unless you want them to,'" despite knowledge of the defect.  (*Id.* at 1 (alteration omitted)).   Gordon's design-defect theory appears to be that the defect occurred when Sig Sauer first used a striker-firing mechanism in a pistol design, rather than the hammer-firing mechanism it had customarily used. (*Id.* at 1–2).   Gordon asserted claims for express and implied warranty breach, Magnuson-Moss Warranty Act violations, unjust enrichment, fraudulent concealment, fraud, and Texas Deceptive Trade Practices Act violations.  (*Id.* at 20–29).

Gordon seeks to represent two classes.  The first proposed class consists of "all persons in the United States who purchased a SIG P320 semi-automatic pistol, in both the full-size and compact versions."  (*Id.* at 18).  The second is "all Class members in Texas."  (*Id.*).  Gordon has not limited the classes by dates.

As to his injuries, Gordon alleges that he has stopped using and "would not have purchased his SIG P320 if he had known that it was not, in fact, properly designed and unduly susceptible to drop fires, or he would not have been willing to pay as much for it."  (*Id.* at 3–4).  Gordon also alleges that the Voluntary Upgrade Program "would not compensate him for his lost use of the pistol during the upgrade period, and it would not compensate him for the significantly diminished resale value of his SIG P320 resulting from the drop fire design defect."  (*Id.* at 4).  Gordon characterizes his lawsuit as intended to ensure that "gun owners like himself are not duped into paying hundreds of dollars for guns that are unsafe.  (*Id.* at 2).

Sig Sauer has moved to dismiss based on: lack of subject-matter jurisdiction due to the absence of the injury-in-fact needed for standing; lack of personal jurisdiction over non-Texas absent putative class members; and failure to state a claim.  (Docket Entry No. 35).  Sig Sauer argues that there is no injury and that the express and implied warranty claims fail, because "the product Gordon claims he bargained for—a P320 without an alleged drop-fire defect—is being provided by SIG Sauer to all customers free of charge."  (*Id.* at 27–34).

On the class allegations, Sig Sauer moves to strike because the proposed definitions are overbroad and fail to satisfy the Federal Rule of Civil Procedure 23 requirements or to show personal jurisdiction over absent non-Texas putative class members.  (*See id.* at 10–11, 13, 18, 23–25).

On the claim-sufficiency challenges, Sig Sauer argues that: Gordon has not alleged facts supporting a plausible inference that Sig Sauer's alleged Deceptive Trade Practices Act violations caused him injury; "[b]rochures and consumer advertising cannot create a warranty enforceable under the [Magnuson-Moss Warranty Act]"; Gordon failed to give Sig Sauer sufficient notice to cure the drop-fire issue before suing for warranty breach, as required under federal and Texas law; Texas law does not recognize stand-alone unjust enrichment or fraudulent concealment claims; and Sig Sauer had no duty to disclose the alleged defect before Gordon purchased his P320.  (*Id.* at 27–34).

Gordon responds that he suffered economic injury from Sig Sauer's defective design and misrepresentations; Sig Sauer's marketing materials created an express warranty that Gordon may enforce under both Texas law and the Magnuson-Moss Warranty Act; the Voluntary Upgrade Program did not remedy Gordon's economic injuries from loss of use and decrease in resale value, and, even if it did, Sig Sauer has not effectively notified P320 owners of the Program; Gordon

provided Sig Sauer sufficient notice of his warranty claims; Texas law recognizes an unjust enrichment claim, and it is pleaded in the alternative; Sig Sauer had a duty to disclose the drop-fire defect in 2014 because "it possessed superior knowledge about firearm" and learned about the defect from "internal testing" in 2014, before the Army informed Sig Sauer of it in 2016; and the amended complaint alleges enough facts to support a plausible inference that the alleged Texas Deceptive Trade Practices Act violations caused Gordon's injuries.  (Docket Entry No. 37 at 10, 18, 22, 24–25, 28–34).  Sig Sauer replied to reiterate its arguments and to emphasize that Gordon lacks Article III standing because he has not alleged a "manifest defect."  (Docket Entry No. 38 at 5–7).  As to the class allegations, Gordon argues that in advance of any effort to certify a class, it is premature to strike the class definitions based on scope or personal jurisdiction as to the putative class members.  (Docket Entry No. 37 at 11).

The parties' arguments and responses are examined in detail below, against the pleadings and the applicable law.

## II.   Analysis

### A.   Subject-Matter Jurisdiction

The threshold issue is whether Gordon has alleged the injury-in-fact needed for Article III standing and subject-matter jurisdiction.  *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) ("[W]e must decide standing first, because it determines the court's fundamental power even to hear the suit.").  Standing requires a plaintiff to plead an (1) injury in fact (2) fairly traceable to the challenged conduct of the defendant (3) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "Standing of the constitutional variety—the well-known injury, causation, and redressability trifecta—is a question of subject matter jurisdiction."  *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017).  "The party invoking

9

federal jurisdiction bears the burden of establishing these elements." *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 173 (5th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentifiable members of the class which they purport to represent." *Singh v. RadioShack Corp.*, 882 F.3d 137, 151 (5th Cir. 2018) (alterations omitted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)); *see Rivera*, 283 F.3d at 319 ("[S]tanding is an inherent prerequisite to the class certification inquiry." (quoting *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001))); *see also Patel v. Facebook, Inc.*, No. 18-15982, 2019 WL 3727424, at *3–4 (9th Cir. Aug. 8, 2019). Gordon must allege facts supporting a plausible inference that he has suffered an injury-in-fact fairly traceable to Sig Sauer, and that a favorable judicial decision would likely redress his injury.

"To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* "The injury in fact test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Rivera*, 283 F.3d at 320 (alteration omitted) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).

Gordon has alleged four injuries: (1) he stopped using his P320 after learning of the drop-fire issue; (2) he would not have purchased a P320, or would have paid less for it, but for Sig

10

Sauer's representations and warranties that the P320 was drop-safe; (3) his P320 has decreased in resale value, even with the Voluntary Upgrade Program availability; and (4) had he used the Voluntary Upgrade Program, he would have been unable to use his P320 while Sig Sauer modified it.  (Docket Entry No. 34 at 3–4).

Sig Sauer argues that these alleged injuries are insufficient for standing because "Gordon received a functioning pistol that has not manifested any defect," and because "he received the benefit of his bargain," a pistol that, according to Sig Sauer, has not drop-fired.  (Docket Entry No. 35 at 15–16).  Gordon has not alleged attempts to sell his pistol, precluding a claim for out-of-pocket costs.  Nor has he sought a fix under the Voluntary Upgrade Program, precluding a claim for loss of use.  Sig Sauer contends that "Gordon may only assert breach-of-contract, benefit-of-the-bargain standing based on a defect that has manifested or that is inevitable."  (Docket Entry No. 38 at 6 (quotation omitted)).  Gordon responds that he has alleged "quintessential economic harm" allowing him to overcome the motion to dismiss.  (Docket Entry No. 37 at 15).

The parties cite two Fifth Circuit cases—*Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449 (5th Cir. 2001), and *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002).  A more recent Fifth Circuit precedent, *Cole v. General Motors Corp.*, 484 F.3d 717 (5th Cir. 2007), is also instructive.

In *Coghlan*, the plaintiffs purchased fishing boats partly made of plywood, but represented as "all-fiberglass."  240 F.3d at 451.  The plaintiffs sued, asserting implied warranty breach, fraud, negligent misrepresentation, contract breach, deceptive trade practices, unjust enrichment, and civil conspiracy.  *Id.*  The district court dismissed the action for failure to allege "any real damages, a required element for each of their causes of action."  *Id.*  The Fifth Circuit reversed and remanded, concluding that the plaintiffs had asserted benefit-of-the-bargain damages under the relevant state

11

law, and that "the determination that there has been no injury in this case must be an evidentiary one," not resolved on the pleadings. *Id.* at 455. The *Coghlan* court characterized the plaintiffs' pleaded damages as sufficient because they were characterized as flowing from the defendant's failure "to uphold its end of the[] bargain and to deliver what was promised." *Id.* at 455 n.4.

In *Rivera*, the defendant manufactured and sold a pain medication that allegedly caused liver failure in some patients. 283 F.3d at 317. The plaintiffs sought to certify a class consisting of "all patients who were prescribed, had purchased, and had ingested [the medication] but suffered *no* physical or emotional injury." *Id.* The plaintiffs asserted Texas Deceptive Trade Practices Act violations, as well as claims for implied warranty breach and unjust enrichment. *Id.* The Fifth Circuit dismissed for lack of standing, concluding that the named plaintiffs had asserted "contract law damages" but had not "actually argue[d] breach of contract." *Id.* at 320. Even assuming that the named plaintiffs had a contract to purchase the pain medication and that they had asserted breach-of-contract claims, the *Rivera* court noted, they "paid for an effective pain killer, and [they] received just that—the benefit of [their] bargain." *Id.*

In *Cole*, a car manufacturer made and sold a vehicle with allegedly defective side-impact air bags that sometimes deployed during normal driving. 484 F.3d at 718–20. The car manufacturer issued a voluntary recall and then a general recall, offering to replace the defective side-impact air bags, free of charge. *Id.* The plaintiffs sued and sought to certify a class of vehicle purchasers, alleging that the car manufacturer "failed to deliver to plaintiffs and the class members the thing purchased" and "breached express and implied warranties of sale." *Id.* at 720. The plaintiffs asked for "return of the purchase or lease price, or, alternatively for a reduction of the purchase or lease price, (i.e., the loss of the benefit of the bargain, or the difference between the

value of the vehicle as delivered and the value it would have had if it had been delivered as warranted)." *Id.* at 720.

The car manufacturer argued that the named plaintiffs "lack[ed] standing because the air bags in their vehicles never deployed inadvertently, and therefore, they cannot have suffered an injury in fact." *Id.* at 722. The named plaintiffs responded that "they have suffered economic loss satisfying the injury-in-fact requirement because [the vehicles had defective side-impact airbags] at the moment of purchase," and because "they contracted to purchase [vehicles] with side impact air bags that would deploy only under certain circumstances involving a side impact[,] but that they received [vehicles] with air bags that could 'deploy unexpectedly, without a crash.'" *Id.*

The *Cole* court began by noting that in *Rivera*, "[t]he plaintiffs could not assert benefit-of-the-bargain damages because they had no contract with the manufacturer." *Id.* at 722. "Although the plaintiffs quantified their injury in terms of economic damages, . . . merely asking for economic damages failed to establish an injury in fact because the plaintiffs never defined the source of their economic injury." *Id.* "The *Rivera* plaintiffs did not assert economic harm emanating from anything other than potential physical harm," and they had admitted that "they never suffered actual physical injuries." *Id.* at 723. The *Cole* court distinguished *Rivera* from the facts before it, explaining that:

> [h]ere, although the plaintiffs do not assert physical injuries (either their own or those of other persons), they do assert their own economic injuries. Plaintiffs allege that each plaintiff suffered economic injury at the moment she purchased a [vehicle] because each [vehicle] was defective. . . . Notably in this case, plaintiffs may bring claims under a contract theory based on the express and implied warranties they allege. . . . [I]t is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they have suffered. . . . We therefore conclude that plaintiffs have established a concrete injury in fact and have standing to pursue this class action.

*Id.*

Gordon alleges that when he bought his P320, he "reviewed the accompanying labels, disclosures, warranties, and marketing materials" and understood them "as representations and warranties by [Sig Sauer] that the P320 was properly designed, was 'drop safe' and 'won't fire unless you want it to.'" (Docket Entry No. 34 at 3). Gordon alleges that he "reviewed the portion of the Sig Sauer website concerning the P320 pistol" before his purchase. (*Id.* (emphasis omitted)).

Gordon does not allege what the material he saw said, but rather that the pistol he received was neither properly designed nor drop-safe, depriving him of the benefit of his bargain by making him unwilling to use the pistol, or requiring him to lose the ability to use it while Sig Sauer was upgrading it, and by reducing the resale value. (*Id.* at 3–4); *see USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2019) (Texas common law permits benefit-of-the-bargain damages); *O.C.T.G., L.L.P. v. Laguna Tubular Prods. Corp.*, 557 S.W.3d 175, 191 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (same). Gordon alleges that Sig Sauer made, and breached, express and implied warranties that the P320 was drop-safe. He claims economic damages "in the amount of the purchase price of the SIG P320 and any consequential damages resulting from the purchases." (Docket Entry No. 34 at 22).

As the Fifth Circuit made clear in *Cole*, Gordon may "bring claims under a contract theory based on the express and implied warranties" he alleges. *Cole*, 484 F.3d at 723. "[I]t is sufficient for standing purposes that [Gordon] seek[s] recovery for an economic harm" that he allegedly suffered.[1] *Id.*; *see also In re Deepwater Horizon*, 739 F.3d 790, 804 (5th Cir. 2014); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp.

---

[1] That Gordon on his own chose simply to stop using his P320 does not itself establish standing, because he has the option to upgrade his P320 for free, fixing the drop-fire issue. This loss of use is self-inflicted. *See Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicting injury."). That does not, however, negate the allegations of a loss of resale value, even with the modification available under the Voluntary Upgrade Program.

2d 1145, 1161 (C.D. Cal. 2010).   Gordon's allegation that the drop-fire defect has decreased his P320's resale value, even with the availability of the Voluntary Upgrade Program, is sufficient to allege economic loss that could be redressed by a judgment ordering compensation. *Coghlan*, 240 F.3d at 455.

At this early stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss," the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, at 504 U.S. at 561 (alteration omitted) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).   Going forward, Gordon must support his alleged injury in fact "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.   On summary judgment, Gordon "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting FED. R. CIV. P. 56(e)).   "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).   But at this stage, standing is sufficiently pleaded to withstand dismissal.

### B.    Personal Jurisdiction Over Non-Texas Putative Absent Class Members

Sig Sauer does not dispute that the court has specific jurisdiction over Gordon and other Texas residents.   Sig Sauer argues that if the proposed nationwide class is certified, this court would lack specific jurisdiction over the non-Texas class members.   Gordon responds that this personal jurisdiction issue "is premature" because "the [c]ourt need not assess personal jurisdiction over plaintiff's putative out-of-state class action claims unless and until the [c]ourt decides a class comprising out-of-state class members merits certification."   (Docket Entry No. 37 at 22 (quoting

*Suarez v. Cal. Nat'l Living, Inc.*, No. 17-CV-9847, 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019))).

Gordon's approach requires more work, time, and expense, but it appears to be supported by the applicable law.  "Where a live controversy does not exist, judicial pronouncements are nothing more than 'advisory opinions on abstract propositions of law.'"  *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam)).  "Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power."  *Id.*; *see Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) ("[A] nonnamed class member is [not] a party to the class-action litigation before the class is certified." (alteration and quotation omitted)).  "Absent class certification, there is no justiciable controversy between [Sig Sauer] and the unnamed putative class members."  *In re Checking*, 780 F.3d at 1037.  Because Gordon has yet to move for class certification, it is premature to rule on whether the court would have specific personal jurisdiction as to the non-Texas putative class members.  The court denies the motion to dismiss for lack of personal jurisdiction, without prejudice.  Sig Sauer may raise this argument again if Gordon moves to certify the proposed nationwide class.[2]

### C.       Failure to State a Claim

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief

---

[2]  Sig Sauer argues that Gordon lacks Article III standing to assert the laws of states other than Texas.  (*See* Docket Entry No. 35 at 17).  It is premature to decide this standing issue, which may be raised again if Gordon seeks to certify a nationwide class.

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The court should generally give a plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile.  *See Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012); *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) ("[Rule 15(a)] evinces a bias in favor of granting leave to amend." (quotation omitted)); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  "Whether leave to amend should be granted is entrusted to the sound discretion of the district court." *Pervasive Software*, 688 F.3d at 232 (quotation omitted).

### 1.    The Warranty Claims

Sig Sauer provided P320 owners, including Gordon, a Lifetime Limited Firearms Warranty, promising that "the enclosed firearm was originally manufactured free of defects in material, workmanship[,] and mechanical function." (Docket Entry No. 35-1).  Gordon has not asserted that Sig Sauer breached the Lifetime Limited Firearms Warranty. (Docket Entry No. 37 at 22 ("Plaintiff's claims are not based on Defendant's Lifetime Limited Warranty.")).  Gordon instead argues that Sig Sauer breached a "separate express warranty regarding the safety of the

SIG Sauer P320 and its implied warrant of merchantability." (*Id.*).  The amended complaint asserts

claims for breach of the express warranty and implied warranty of merchantability, as well as for

Magnuson-Moss Warranty Act violations.  (Docket Entry No. 34 at 20–24).

### i.   The Magnuson-Moss Warranty Act Claims

The Magnuson-Moss Warranty Act provides a cause of action to "a consumer who is

damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation

[under the Act], or under a written warranty, implied warranty, or service contract."  15 U.S.C.

§ 2310(d)(1); *see Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 474 (5th Cir. 2002).[3]  The

Act defines an "implied warranty" as "an implied warranty arising under State law . . . in

connection with the sale by a supplier of a consumer product."  15 U.S.C. § 2301(7).  The Act

defines a "written warranty" as:

> any written affirmation of fact or written promise made in connection with the sale
> of a consumer product by a supplier to a buyer which relates to the nature of the
> material or workmanship and affirms or promises that such material or
> workmanship is defect free or will meet a specified level of performance over a
> specified period of time.

15 U.S.C. § 2301(6)(A).[4]  Because the Act permits a plaintiff to sue a manufacturer for failing to

comply with an implied warranty "arising under State law," Gordon may assert a Texas-law

implied warranty claim.  15 U.S.C. §§ 2301(7), 2310(d)(1).

---

[3] The Magnuson-Moss Warranty Act does not provide a cause of action if "the amount in controversy is less than the sum or value of $50,000 . . . computed on the basis of all the claims to be determined in th[e] suit."  *Scarlott v. Nissan N. Am., Inc.*, 771 F.3d 883, 887 (5th Cir. 2014) (quoting 15 U.S.C. § 2310(d)(3)).

[4] The Act recognizes both full and limited warranties.  15 U.S.C. § 2303(a).  Full warranties meet "the Federal minimum standards for warranty," as set forth in the Act; limited warranties fall short of the federal standards.  *Id.* §§ 2303(a), 2304.  The Act provides remedies for full warranty breach, "including either a full refund of the purchase price or a replacement of the product if the warrantor cannot remedy defects or malfunctions after reasonable attempts to do so."  *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004).  "Limited warranties and implied warranties are not subject to the same standards as full warranties."  *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011) (quotations

Sig Sauer argues that "Gordon does not point to any advertising, marketing, labeling, or disclosure that constitute[s] a written warranty under the [Act] because none of the allegations promise a specific period of time the promised performance would occur." (Docket Entry No. 35 at 29). Gordon has not argued that Sig Sauer represented in writing that the P320 would "meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A). Even if it had, "a written affirmation of fact or a written promise of a specified level of performance must relate to a specified period of time in order to be considered a 'written warranty,'" and Gordon has not alleged that Sig Sauer made representations about the P320 during specific periods. 16 C.F.R. § 700.3(a); *see Skelton v. Gen. Motors Corp.*, 660 F.2d 311, 316 n.7 & 322 (7th Cir. 1981); *Hairston v. S. Beach Beverage Co., Inc.*, No. CV-12-1429, 2012 WL 1893818, at *6 (C.D. Cal. May 18, 2012).

Gordon argues that Sig Sauer represented in writing that the P320 was "defect free," and that this representation is a "written warranty" under the Act. (Docket Entry No. 37 at 27). The Magnuson-Moss Warranty Act "defines written warranty narrowly and 'courts have declined to extend the term beyond its statutory definition.'" *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 615 (E.D. Mich. 2017) (alterations omitted) (quoting *In re ConAgra Foods*, 908 F. Supp. 2d 1090, 1102 (C.D. Cal. 2002)); *see Semitekol v. Monaco Coach Corp.*, 582 F. Supp. 2d 1009, 1026 (N.D. Ill. 2008). "The unambiguous statutory definition of a written affirmation-of-fact warranty requires the warrantor to make an *affirmation or promise* of defect-free performance." *Schechner*, 237 F. Supp. 3d at 615. "For example, a mere 'product description' may implicitly promise a product will meet expectations or not fall short, but it does not affirmatively promise defect-free performance and it therefore falls outside [the Act's] definition." *Id.*

---

omitted). But the Act permits consumers to "enforce limited written and implied warranties in federal court, . . . borrowing state law causes of action." *Id.* (alterations omitted) (quoting *Schimmer*, 384 F.3d at 405).

Gordon alleges that, during the "Safety Without Compromise marketing campaign," Sig Sauer represented that the P320 was "drop safe" and would not fire "unless the trigger is pulled." (Docket Entry No. 34 at 5–6 (internal quotation marks omitted)).   Even assuming that these statements are affirmative promises of a defect-free performance, which is unclear given the case law,[5] Gordon has not alleged that he read or relied on specific marketing statements before purchasing his P320, where he read them, or that Sig Sauer made these representations before his purchase.   He instead alleges that, before purchasing his P320, he "understood" unspecified information on Sig Sauer's website and unspecified "accompanying labels, disclosures, warranties, and marketing materials" as "representations and warranties."   (Docket Entry No. 34 at 3–4).   It is unclear what affirmative promises the website or these "materials" contained.

The court dismisses the Magnuson-Moss Warranty Act claim of breach of written warranties, without prejudice and with leave to amend.

### ii.     Notice

If Gordon has alleged plausible claims of warranty breach under Texas law, he may allege a plausible Magnuson-Moss Warranty Act violation.   But to sue for failure to comply with a warranty under the Act, a "consumer must give persons obligated under the warranty a reasonable

---

[5] *See, e.g.*, *Schechner*, 237 F. Supp. 3d at 615 ("Whirlpool's advertisement—that the oven would self-clean in under an hour—makes no affirmative promise of defect-free performance."); *Forcellati v. Hyland's, Inc.*, No. CV-12-1983, 2015 WL 9685557, at *6 (C.D. Cal. Jan. 12, 2015) ("Nor have Defendants promised that the Class Products are 'defect free,' because guaranteeing that something is effective or fast-acting is not a guarantee that it will not have flaws."); *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13-CV-1725, 2014 WL 4054240, at *12 (S.D.N.Y. Aug. 15, 2014) ("The words '100% cotton' and a stated thread count, however, cannot constitute a written warranty under the [Act] because neither of these labels promises that the sheets are defect-free nor that they will meet a specified level of performance over a specified period of time."); *cf. Larsen v. Trader Joe's Co.*, No. C 11-5188, 2012 WL 5458396, at *5 (N.D. Cal. June 14, 2012) ("[D]efect" means "the fact of being wanting or falling short; a blemish or flaw" (alteration omitted)).

20

opportunity to 'cure' their failure to comply with the obligations at issue." *Walton*, 298 F.3d at 474 (quoting 15 U.S.C. § 2310(e)).  The Act states that:

> No action (other than a class action or an action respecting a warranty to which subsection (a)(3) applies) may be brought under subsection (d) for failure to comply with any obligation under any written or implied warranty or service contract, and a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply.  In the case of such a class action (other than a class action respecting a warranty to which subsection (a)(3) applies) brought under subsection (d) for breach of any written or implied warranty or service contract, such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 2310(e).

"The plain language of the statute imposes different requirements on individual plaintiffs and class action plaintiffs regarding the time at which they must satisfy the opportunity to cure requirement." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 824 (S.D. Ohio 2012).  "[A] named plaintiff in a class action may bring an action prior to affording the defendant an opportunity to cure, for the purpose of establishing his or her representative capacity." *In re Shop-Vac Mktg. & Sales Practices Litig.*, 964 F. Supp. 2d 355, 362 (M.D. Pa. 2013).  The named plaintiff "may *file* a class action, but may not *proceed* with that action, until she has afforded the defendant a reasonable opportunity to cure its alleged breach." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1004 (D.C. Cir. 1986).  "While the class action is held in abeyance pending possible cure, the district court may rule on the representative capacity of the named plaintiffs."[6] *Id.*; *see In re Amla Litig.*,

---

[6] Some courts have held that even class action plaintiffs cannot file suit until the warrantor is given notice and a reasonable opportunity to cure.  *See, e.g., Parker v. Wal-Mart Stores, Inc.*, 367 F. Supp. 3d 979, 984 (E.D. Mo. 2019); *Rojas v. Bosch Solar Energy Corp.*, 18-CV-05841, 2019 WL 2288279, at *7

320 F. Supp. 3d 578, 596 (S.D.N.Y. 2018) ("[T]he fairest reading of this somewhat convoluted portion of the statute is that a class action, unlike individual actions, can be 'brought' even if the named plaintiffs have not provided notice of or an opportunity to cure their individual claims."); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 216 (S.D. Ill. 2018) ("[P]utative [Magnuson-Moss Warranty Act] class actions may proceed to the extent necessary to establish the representative capacity of the named plaintiffs prior to providing a defendant with notice and an opportunity to cure."). "Notice and opportunity to cure are required, however, for the class action to 'proceed' once the [c]ourt determines that the named plaintiffs are adequate representatives under Rule 23(a)(4) of the Federal Rules of Civil Procedure." *Amla*, 320 F. Supp. 3d at 596.

Gordon sent Sig Sauer presuit notice about the alleged P320 warranty breach on February 19, 2019, one day before he filed this suit. (Docket Entry No. 34-1 at 2). While one day does not provide Sig Sauer with a reasonable opportunity to cure, Gordon may proceed to seek class certification on the Magnuson-Moss Warranty Act claim. *See, e.g.*, *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025, 1044 (S.D. Tex. 2016) ("Based on the language of the statute the court is persuaded by this reasoning, and Plaintiffs' [Magnuson-Moss Warranty Act] claim will not be dismissed for failure to provide Defendants pre-suit notice that Plaintiffs were acting on behalf of a class."). But this lawsuit cannot proceed from there until Sig Sauer has had a reasonable opportunity to cure. *Walsh*, 807 F.2d at 1004.

---

(N.D. Cal. May 29, 2019) ("Plaintiff's position has been rejected by numerous district courts within the Ninth Circuit, which have construed § 2310(e) to require pre-suit notice and opportunity to cure before a class action may be brought under the [Act]."); *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 936 (M.D. Tenn. 2010); *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1143 (N.D. Cal. 2010). Both the statutory language and weight of authority support allowing a class action plaintiff to file the class action before giving notice and a reasonable opportunity to cure, for the limited purpose of establishing "the representative capacity of the named plaintiffs." 15 U.S.C. § 2310(e).

Sig Sauer's motion to dismiss for insufficient notice and opportunity to cure is denied.  The court notes that, based on the allegations, Sig Sauer appears to have had an opportunity to cure, because it has known of the issue since the 2016 Army notification and it has implemented both a changed design and the Voluntary Upgrade Program.  The parties have not argued this point.

### iii.    The Texas Warranty Breach Claims

Texas law also requires a plaintiff to notify the warrantor of alleged express and implied warranty breaches before suing.  *See Ketter v. ESC Med. Sys., Inc.*, 169 S.W.3d 791, 796 (Tex. App.—Dallas 2005, no pet.); *McKay v. Novartis Pharms. Corp.*, 934 F. Supp. 2d 898, 913 (W.D. Tex. 2013), *aff'd* 751 F.3d 694, 706 (5th Cir. 2014) ("The court finds the reasoning of the majority of intermediate Texas appellate court decisions persuasive, and believes the Texas Supreme Court would likely hold that a buyer is required to give notice of an alleged breach of warranty to a remote seller/manufacturer, pursuant to Section 2.607(c)(1).").

These notice requirements "spring[] from the same source—section 2.607(c)(1) of the Texas Business and Commerce Code."  *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 201 (Tex. App.—Houston [1st Dist.] 2003, no pet.).  "It is not essential that the buyer's notification of a defective product specifically set forth in detail every objection the buyer has to the fitness of the product; it is only necessary that the seller be informed that there is a claimed breach of the warranty of fitness."  *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 189–90 (Tex. App.—Dallas 1996, no pet.).  "A general expression of the buyer's dissatisfaction with the product may be sufficient."  *Boeran*, 110 S.W.3d at 201.  "A person has 'notice' of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, [the person] has reason to know that it exists."  *Galaxy Powersports, LLC v. Benzhou Vehicle Indus. Grp. Co., Ltd.*, No. 10-CV-360, 2012

WL 13024094, at *5 (N.D. Tex. Sept. 27, 2012) (alteration omitted) (quoting TEX. BUS. & COM. CODE § 1.202(a)).

"To maintain an action for a breach of warranty[,] a buyer is required to notify the seller that a breach occurred within a reasonable time after he discovers or should have discovered any breach." *Scruggs Consulting v. Goldsmith's, Inc.*, No. 05-98-162-CV, 2000 WL 1056495, at *3 (Tex. App.—Dallas 2000, no pet.); *see Boeran*, 110 S.W.3d at 198 ("[A] buyer is required to give notice of an alleged breach of warranty to a remote manufacturer."). Some Texas courts have read this requirement to include a reasonable opportunity to cure. *Hull v. S. Coast Catamarans, L.P.*, 365 S.W.3d 35, 44 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *see Scruggs*, 2000 WL 1056495, at *3 (same); *Lochinvar*, 930 S.W.2d at 189 (same). The most recent Texas case law has held that the notice requirement does not require a plaintiff to allow an opportunity to cure. *See Equistar Chems., LP v. ClydeUnion DB, Ltd.*, No. 14-17-791-CV, 2019 WL 2134642, at *9–10 (Tex. App.—Houston [14th Dist.] May 16, 2019, pet. filed).

Sig Sauer argues that Gordon did not notify Sig Sauer "within a reasonable time" after he discovered, or should have discovered, the drop-fire issue. (Docket Entry No. 35 at 30 (quotation omitted)).[7] The Army discovered the drop-fire issue in April 2016, and the issue gained publicity through August 2017, when Sig Sauer implemented the Voluntary Upgrade Program and changed the pistol design. (Docket Entry No. 34 at 6–18). Gordon filed this lawsuit in February 2019. Gordon does not allege when he learned of the drop-fire issue, but he did notify Sig Sauer of his dissatisfaction and of his intent to claim a breach of warranty the day before he filed this suit. (Docket Entry No. 34-1).

---

[7] Because Sig Sauer does not argue that Texas law requires a reasonable opportunity to cure, and Texas law is unsettled on the matter, the court need not address that argument.

"Ordinarily, notice is a question of fact to be determined by the trier of fact." *Ketter*, 169 S.W.3d at 799. "It becomes a matter of law only where there is no room for ordinary minds to differ about the proper conclusion to be drawn from the evidence." *Id.* The amended complaint alleges that the Army informed Sig Sauer of the drop-fire issue in 2016; that Sig Sauer fixed the issue for the military version of the P320; implemented the Voluntary Upgrade Program for the civilian version in 2017; and modified the design for pistols made in and after August 2017. It also alleges that Sig Sauer discussed the drop-fire issue in the "Frequently Asked Questions" section of its website. The amended complaint does not indicate when these "discussions" were first posted. These facts support a plausible inference that Sig Sauer was on actual notice of the drop-fire issue, and Sig Sauer "does not explain why the period between [Gordon's] discovery of the breach and his giving notice was unreasonable as a matter of law." *Id.* at 800. The court declines to dismiss his Texas law implied warranty claim for failure to give timely notice at this stage. Sig Sauer may raise this argument at a later stage of the litigation, on a fuller record.

### iv.    The Express Warranty Claim

Gordon has asserted a breach of express warranty claim under Texas law. *Cf. Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011) (the Magnuson-Moss Warranty Act allows "state law claims along with . . . federal claims"). Sig Sauer argues that Gordon cannot state a plausible express warranty claim because he did not send his P320 to Sig Sauer under the Voluntary Upgrade Program. But a Texas court has recently held that "a buyer who has accepted nonconforming goods is under no duty to accept an offer of cure by the seller." *Equistar*, 2019 WL 2134642, at *10 (quoting *Bonebrake v. Cox*, 499 F.2d 951, 957 (8th Cir. 1974)). "His refusal to do so raises only the question of whether he has properly mitigated his damages; it does not

extinguish his right to recover." *Id.* (quoting *Bonebrake*, 499 F.2d at 957). Sig Sauer's argument is insufficient at this stage.

To state a claim for express warranty breach, "a buyer must prove (1) an affirmation of fact or promise made by the seller to the buyer relating to the goods; (2) such affirmation of fact or promise became a part of the basis of the bargain; (3) that the injured party, in making the purchase, relied on the representations, affirmation of fact or promise; (4) that the goods sold by the seller failed to comply with the affirmation of fact or promise made by the seller; (5) that the buyer was financially injured; and (6) that such failure to comply was a proximate cause of the financial injury suffered by the buyer." *Minsa Corp. v. SFTC, LLC*, 540 S.W.3d 155, 161 (Tex. App.— Amarillo 2017, no pet.).

Gordon alleges that when making his P320 purchase, he "reviewed" and "relied on" information on Sig Sauer's website and "accompanying labels, disclosures, warranties, and marketing materials," understanding them "as representations and warranties by SIG that the P320 was properly designed, was drop safe[,] and won't fire unless you want it to." (Docket Entry No. 34 at 3) (internal quotation marks omitted). But Gordon has not alleged what he saw. *Minsa*, 540 S.W.3d at 161. Instead, he alleges what he "understood" from the statements in the materials at the time of purchase. (Docket Entry No. 34 at 3). Gordon alleges that Sig Sauer marketed the P320 as "drop safe" during the "Safety Without Compromise" marketing campaign, (*id.* at 5–6), but he does not allege when the campaign began, when he saw the campaign statements, what they said or that he relied on them when purchasing his P320. The amended complaint is insufficient to allege that the materials Gordon reviewed before buying his P320 pistol contained an "affirmation of fact or promise" that created an express warranty. *Minsa*, 540 S.W.3d at 161.

The express warranty claim is dismissed, without prejudice and with leave to amend.

26

### v.      The Implied Warranty of Merchantability

Gordon's Magnuson-Moss Warranty Act claim "stand[s] or fall[s] with his . . . implied warranty claims under [Texas] law."[8]  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008); *see Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 600 (D.N.J. 2016) ("Claims under the [Act] depend upon the disposition of the underlying state law warranty claims.").  "[I]f there is no implied warranty of merchantability, or a breach thereof, [Gordon] cannot be successful in his claim under the Act."  *Polaris Indus. Inc. v. McDonald*, 119 S.W.3d 331, 337 (Tex. App.—Tyler, 2003, no pet.).

Under Texas law, the implied warranty of merchantability requires that goods "pass without objection in the trade under the contract description"; "are of fair average quality within the description"; "are fit for the ordinary purposes for which such goods are used"; and "conform to the promises or affirmations of fact made on the container or label."  TEX. BUS. & COM. CODE § 2.314(b).  "The implied warranty of merchantability applies in every contract for goods, unless specifically bargained out of the agreement."  *Elliott v. Kraft Foods N. Am., Inc.*, 118 S.W.3d 50, 56 (Tex. App.—Houston [14th Dist.] 2003, no pet.).  "The elements of a cause of action for breach of the implied warranty of merchantability are as follows: 1) the defendant sold or leased a product to the plaintiff; 2) the product was unmerchantable; 3) the plaintiff notified the defendant of the breach; and 4) the plaintiff suffered injury."  *Polaris*, 119 S.W.3d at 336.  The plaintiff must show that "the breach of the warranty was the proximate cause of the loss sustained," meaning that "the defendant was the cause in fact of the plaintiff's injuries."  *Mott v. Red's Safe & Lock Servs., Inc.*,

---

[8]  *See also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016) ("The claims under the Magnuson-Moss [Warranty] Act are identical to the other warranty claims because they are also based on state law." (citing *Walsh*, 807 F.2d at 1012)).

249 S.W.3d 90, 99 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting TEX. BUS. & COM. CODE § 2.314 cmt. 13).

Texas law permits Gordon to sue Sig Sauer, a "remote manufacturer," for breach of an implied warranty of merchantability. *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 137–38 (Tex. 2014) (citing *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 77–78 (Tex. 1977)).  Gordon alleges that drop-fire issue makes the P320 unfit for its ordinary purposes. (Docket Entry No. 34 at 23).  "For a product to be unfit for ordinary purposes, it must have a defect, i.e., the product lacks something necessary for adequacy." *Polaris*, 119 S.W.3d at 336.  "A product can lack something necessary for adequacy when it does not accomplish the purposes for which it was manufactured, or when it is constructed in a manner which makes it 'unreasonably dangerous.'"  *Id.*  Because Gordon has alleged that the P320 may fire a round if accidentally dropped, and that properly designed handguns do not pose this risk, he has alleged facts supporting a plausible inference that the P320 is unreasonably dangerous as designed, making it unmerchantable.

Sig Sauer argues that Gordon's warranty-breach claims fail because "his pistol has never manifested the purported defect and Gordon used his P320 for years before he allegedly stopped using it." (Docket Entry No. 38 at 13).  According to Sig Sauer, "[c]ourts have consistently found that, when a product was used for years without problems, [it was] merchantable and fit for its ordinary use at the time of sale."  (*Id.*).

The Texas Supreme Court has noted that "[Texas] law is not well developed on the degree to which the defect must actually manifest itself before it is actionable" for "breach of implied warranties." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008); *see also Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 852–56 (Tex. App.—Fort Worth 2005, no pet.) ("The Texas

Supreme Court has not yet addressed which claims, if any, a plaintiff possesses standing to assert based on an unmanifested product defect that causes only economic damages."); *Gen. Motors Corp. v. Garza*, 179 S.W.3d 76, 83 n.11 (Tex. App.—San Antonio 2005, no pet.).  A plaintiff may bring an implied warranty breach claim if the alleged defect "will inevitably manifest itself in the ordinary use of the product." *Everett*, 178 S.W.3d at 856.  The pleadings are inadequate to determine whether enough pistols dropped to the floor in ordinary fire or if this means at least some number of pistols will "inevitably" manifest the defect. *Id.*  The court denies the motion to dismiss on this ground.

Lastly, Sig Sauer argues that Gordon's warranty claims fail as a matter of law because Sig Sauer has offered to fix the P320 drop-fire issue.  (*See* Docket Entry No. 38 at 12–13; Docket Entry No. 35 at 27–28).  As discussed above, recent Texas case law indicates that a refusal to accept an offer to cure "does not extinguish [a buyer's] right to recover." *Equistar*, 2019 WL 2134642, at *10 (quotation omitted).  In light of this case law and the amended complaint allegations, the motion to dismiss the implied warranty claim is denied.

### 2. The Unjust Enrichment Claim

Sig Sauer argues that unjust enrichment "is not a recognized cause of action under Texas law" and that, even if it was, "Gordon's unjust enrichment claim fails because he has an adequate remedy at law."  (Docket Entry No. 35 at 30).  Gordon responds that Texas courts have treated unjust enrichment as an independent cause of action under Texas law, but he admits that an unjust enrichment claim fails as a matter of law when the parties have a contract.  (Docket Entry No. 37 at 29–30).  Gordon argues that his unjust enrichment claim is pleaded in the alternative, as permitted under Federal Rule of Civil Procedure 8(d)(3).  (*Id.* at 30).

"Texas courts recognize unjust enrichment as an independent cause of action." *Banion v. Geovera Specialty Ins. Co.*, No. H-15-1595, 2016 WL 7242536, at *3 (S.D. Tex. Dec. 15, 2016) (citing *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010); *Elledge v. Friberg–Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007) (per curiam)). "Unjust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain benefits received." *Id.* It "allows recovery 'when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.'" *Id.* (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). "A plaintiff may also recover under this equitable doctrine if a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons." *Id.* (quoting *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet)).

"Unjust enrichment is not a proper remedy, however, merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss or because the benefits to the person sought to be charged amount to a windfall." *Eun Bok*, 411 S.W.3d at 112. "As a remedy based on quasi-contract principles, unjust enrichment is unavailable when a valid, express contract governing the subject-matter of the dispute exists." *Id.*

Sig Sauer argues that Gordon's unjust enrichment claim should be dismissed because it is "duplicative of his other causes of actions" and because "he has an adequate remedy at law." (Docket Entry No. 38 at 16). But "there is no requirement that a claimant who seeks [equitable remedies] . . . must first demonstrate the inadequacy of a remedy at law." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 4 (2011). Sig Saur has not explained how Gordon's unjust enrichment claim merely duplicates his other claims, or why pleading in the alternative is

impermissible.  *See* FED. R. CIV. P. 8(d)(3).  The motion to dismiss the unjust enrichment claim is denied.

### 3.     The Fraud Claims

Gordon asserts fraudulent concealment.  (Docket Entry No. 34 at 24–25).  Sig Sauer argues that Texas law does not recognize fraudulent concealment as a cause of action.  (Docket Entry No. 35 at 31).  "[F]raudulent concealment is an affirmative defense to the statute of limitations; it is not an independent cause of action."  *Cooper v. Trent*, 551 S.W.3d 325, 335 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).  "[F]raudulent concealment[] 'is a fact-specific equitable doctrine that tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence.'"  *Souther Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-1176-CV, 2018 WL 3454801, at *4 (Tex. App.—Dallas July 18, 2018, no pet.) (quoting *Valdez v. Hollenbeck*, 465 S.W.3d 217, 229 (Tex. 2015)).  "[W]hen fraudulent concealment is alleged, 'accrual is deferred because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run.'"  *Cody Tex., L.P. v. BPL Expl., Ltd.*, 513 S.W.3d 522, 535 (Tex. App.—San Antonio 2016, no pet.) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)).  Because fraudulent concealment is not an independent cause of action, but an affirmative defense, Gordon's fraudulent concealment claim is dismissed, with prejudice and without leave to amend because amendment would be futile.

Gordon also alleges fraud by nondisclosure and by misrepresentation.  "Fraud by nondisclosure is considered a subcategory of common-law fraud."  *Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557 S.W.3d 245, 261 (Tex. App.—Fort Worth 2018, no pet.) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).  "The elements of fraud by nondisclosure are (1) the defendant deliberately failed to disclose material

facts to the plaintiff that the defendant had a duty to disclose, (2) the defendant knew the plaintiff

was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover them,

(3) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action

or refrain from acting, and (4) the plaintiff relied on the nondisclosure and suffered injury as a

result of that reliance." *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 801 (Tex. App.—Houston

[14th Dist.] 2019, no pet.) (quotation omitted).  "Fraud by misrepresentation requires 'a material

misrepresentation, which was false, and which was either known to be false when made or was

asserted without knowledge of its truth, which was intended to be acted upon, which was relied

upon, and which caused injury.'" *Id.* (quoting *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143,

153 (Tex. 2015)).

The federal pleading rules "impose[] a heightened pleading standard in cases where the

plaintiff alleges fraud or mistake: particularity." *Matter of Life Partners Holdings, Inc.*, 926 F.3d

103, 116–17 (5th Cir. 2019).  Federal Rule of Civil Procedure 9(b) states that:

> In alleging fraud or mistake, a party must state with particularity the circumstances
> constituting the fraud or mistake.  Malice, intent, knowledge, and other conditions
> of a person's mind may be alleged generally.

"When the Rule 9(b) pleading standard applies, the complaint must contain factual allegations

stating the 'time, place, and contents of the false representations, as well as the identity of the

person making the misrepresentation and what that person obtained thereby." *Matter of Life

Partners*, 926 F.3d at 117 (alteration omitted) (quoting *Tuchman v. DSC Comm'cns Corp.*, 14 F.3d

1061, 1068 (5th Cir. 1994)).  "[T]o properly allege fraud under Rule 9(b), the plaintiff must plead

the who, what, when, where, and why as to the fraudulent conduct." *Id.*

"While Rule 9(b) provides that intent and knowledge 'may be alleged generally,' this is

not license to base claims of fraud upon conclusory allegations." *City of Clinton v. Pilgrim's Pride*

*Corp.*, 632 F.3d 148, 154 (5th Cir. 2010).  The plaintiff must allege a "plausible" basis for intent and knowledge under Rule 8.  *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260–61 (5th Cir. 2014); *see Iqbal*, 556 U.S. at 686–87 ("[Rule 9(b)'s 'generally' language] does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8. . . .  And Rule 8 does not empower a respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss.").

### i.      Fraud by Misrepresentation

The amended complaint alleges that Sig Sauer stated on "its website and other places" that the P320 was "drop safe" and "won't fire unless you want [it] to." (*Id.* at 5–6).  Gordon does not allege when these statements were made (in what day, month, or year), or where they were made (other than on Sig Sauer's website and "other places"), or whether Sig Sauer made these statements before or after Gordon bought his pistol.  The amended complaint sheds no light on these questions, despite the requirement that Gordon allege with particularity the "who, what, when, where, and why as to the fraudulent conduct." *Matter of Life Partners*, 926 F.3d at 117.[9]  The amended complaint allegations are not enough to meet Rule 9(b)'s heightened pleading standard.

Gordon also alleges that "[w]hen purchasing his SIG P320 pistol," he reviewed "accompanying labels, disclosures, warranties, and marketing materials." (*Id.* at 3).  According to Gordon, he "understood" these materials "as representations and warranties by SIG that the P320 was properly designed, was drop safe[,] and won't fire unless you want it to." (*Id.*) (internal quotation marks omitted).  But these allegations are about what Gordon "understood," not what

---

[9] Gordon alleges that Ron Cohen, the Sig Sauer Chief Executive Officer, misrepresented on August 4, 2017, that no "drop-related P320 incidents [had occurred] in the U.S. Commercial market." (Docket Entry No. 34 at 11).  Gordon bought his P320 in 2014, three years earlier, and he could not have relied on this statement in making the purchase.

33

the disclosures, warranties, and marketing materials said about the P320, when Gordon saw them, and what he relied on before purchasing his P320 pistol.  The fraud by misrepresentation claim is dismissed, without prejudice and with leave to amend.

### ii.   Fraud by Nondisclosure

Gordon alleges that Sig Sauer knew of the drop-fire issue from "its own internal testing" since "at least 2014," but that Sig Sauer represented that the P320 is "drop safe" and "won't fire unless you want it to," on its website.  (Docket Entry No. 34 at 2, 5–6 (quotation omitted)).  Gordon alleges that Sig Sauer "concealed the design defect"; "has not issued a mandatory recall"; and has not explained "the nature of the design defect [or] the importance of the fix anywhere on its website [or] promotional materials."  (*Id.* at 26).

Sig Sauer argues that Gordon's fraud-by-nondisclosure claim fails because he has not alleged facts supporting a plausible inference that "he and SIG Sauer are in a fiduciary or confidential relationship," or that Sig Sauer knew about the drop-fire issue in 2014, when Gordon purchased his P320.  (Docket Entry No. 35 at 31–33).  Gordon argues that Sig Sauer's "voluntary, partial[,] and misleading disclosures about the safety of the SIG P320 created a duty . . . to inform [Gordon] about the drop fire issue."  (Docket Entry No. 37 at 31–32).  According to Gordon, the allegation that Sig Sauer "conducted pre-sale testing" of the P320 and discovered "a drop-fire defect" supports a plausible inference that Sig Sauer knew of the defect when it made the representations that Gordon understood as promising a pistol that would not drop-fire when he made his purchase.  (*Id.* at 32).

"A duty to disclose may arise (1) when there is a confidential or fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier

representation misleading or untrue; and (4) when one makes a partial disclosure that conveys a false impression." *Spencer & Assocs., P.C. v. Harper*, No. 01-18-314-CV, 2019 WL 3558996, at *5 (Tex. App.—Houston [1st Dist.] Aug. 6, 2019, no pet.).  Gordon alleges that he reviewed  Sig Sauer's website and the P320's "accompanying labels, disclosures, warranties, and marketing materials" when making his purchase.  (Docket Entry No. 34 at 3).  Gordon alleges that he "understood" these as "representations and warranties" that "the P320 was properly designed, was drop safe[,] and won't fire unless you want it to."  (*Id.* (internal quotation marks omitted)).  Gordon's "understanding" of the labels, disclosures, warranties, and marketing materials does not equate to what those documents said, and does not support an inference that they created a duty for Sig Sauer to disclose the drop-fire issue, even taking as true the allegation that Sig Sauer learned of that issue through internal testing in 2014.

Because Gordon has not sufficiently alleged what Sig Sauer disclosed about the P320 when he made the purchase in 2014, or how and when those disclosures were made, the pleadings do not sufficiently allege that Sig Sauer had and breached a duty to disclose the drop-fire issue when Gordon made his purchase.  The fraud-by-nondisclosure claim is dismissed, without prejudice and with leave to amend.

### 4.    The Texas Deceptive Trade Practices Act Claim

Gordon alleges that Sig Sauer violated the Texas Deceptive Trade Practices Act by making "numerous [mis]statements about the safety of the SIG P320 pistols, including that they were drop safe and won't fire unless you want them to"; breaching express and implied warranties; and committing "an unconscionable action or course of conduct."  (*Id.* at 28–29 (alteration and internal quotation marks omitted)).  The Texas Deceptive Trade Practices Act was "enacted to 'protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and

breaches of warranty' and to provide consumers with a means to redress deceptive practices 'without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit.'" *Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) (quoting TEX. BUS. & COM. CODE § 17.44(a)). "[A] consumer may bring suit against any person whose false, misleading, or deceptive acts, or other practices enumerated in the Act are the producing cause of the consumer's harm." *Id.* (emphasis omitted) (citing TEX. BUS. & COM. CODE § 17.50(a)(1)); *Williamson v. Howard*, 554 S.W.3d 59, 70–71 (Tex. App.—El Paso 2018, no pet.).

The parties have not disputed that Gordon is a consumer under the Act. As with the fraud claims, Sig Sauer argues that Gordon fails to allege a plausible Texas Deceptive Trade Practices Act violation based on false, misleading, or deceptive statements about the P320's safety. (Docket Entry No. 35 at 31–33). Gordon has alleged what he understood the Sig Sauer's website and the "labels, disclosures, warranties, and marketing materials," but not what statements these materials contained, or what he saw, before he bought the pistol. (Docket Entry No. 34 at 3–4). While Gordon alleges that Sig Sauer made misstatements during the "Safety Without Compromise marketing campaign," Gordon has not alleged when Sig Sauer ran that campaign, or what specific campaign statements he saw and relied on when he purchased his P320. (*Id.* at 5–6 (internal quotation marks omitted)). The allegations are insufficient to state a claim that Sig Sauer violated the Texas Deceptive Trade Practices Act because of these statements. Gordon's Texas Deceptive Trade Practices Act claims based on false, deceptive, and misleading statements are dismissed, without prejudice and with leave to amend.

Sig Sauer has not argued that Gordon's Texas Deceptive Trade Act claims based on warranty breach should be dismissed. The court has declined to dismiss the implied warranty claim and allowed Gordon to amend his express warranty claim. *See Codner v. Arellano*, 40

S.W.3d 666, 672 (Tex. App.—Austin 2001, no pet.) ("The DTPA creates no warranty; to be actionable under the DTPA's prohibition on breaching implied or express warranties, a warranty must be recognized by common law or created statutorily."). Sig Sauer has not explained why the Texas Deceptive Trade Practices Act claim based on unconscionable conduct should be dismissed, and the court declines to do so on this record.[10]

### D.   The Proposed Class Definitions

Federal Rule of Civil Procedure 23 "governs whether a proposed class falls within the limited exception to 'the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (quoting *Califano v. Yamaski*, 422 U.S. 682, 700–01 (1979)). "Four prerequisites must be met by all cases: numerosity, commonality, typicality, and adequacy of representation." *Id.*; *see Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017). Gordon has not alleged that Sig Saur has refused to act on generally applicable grounds or that individual adjudication risks inconsistent or incomplete relief. He seeks class certification under Rule 23(b)(3). (*See* Docket Entry No. 34 at 18; Docket Entry No. 37 at 19 (citing predominance cases)).

"[A] party seeking class certification under Rule 23(b)(3) must also demonstrate 'both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy.'" *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006) (quoting

---

[10] Sig Sauer does generally argue that Gordon "failed to adequately plead one of the violations of the [Texas Deceptive Trade Practices Act] was a producing cause of his injury." (Docket Entry No. 35 at 34). But Gordon alleges that he "understood" from Sig Sauer's website, marketing materials, warranties, other documents that the P320 was drop safe; he relied on the representations and warranties in those materials when purchasing his P320; the representations were false and Sig Sauer breached the warranty; and he suffered economic harm from those false statements and warranty breaches. (Docket Entry No. 34 at 3–4).

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003)); *see Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635–36 (5th Cir. 2016). The party seeking certification must demonstrate that the requirements of Rule 23 have been met. *Ibe*, 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003)).

The court may "require that the pleadings be amended to eliminate allegations about representation of absent persons" and to "deal with similar procedural matters." FED. R. CIV. P. 23(d)(1)(D)–(E). "Courts have routinely applied [this rule] . . . to actions where a party seeks to strike class allegations because plaintiffs have not met the requirements of Rule 23." *Carlisle v. Normand*, No. 16-CV-3767, 2017 WL 2256789, at *5 (E.D. La. May 23, 2017).[11] "The district court maintains great discretion in certifying and managing a class action." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 478 (5th Cir. 2001) (alteration omitted) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018).

Sig Sauer focuses on commonality and predominance. Rule 23(a)(2) requires that there be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). To satisfy commonality, "class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d at 810. The common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its

---

[11] *See Reedy v. Phillips 66 Co.*, No. H-17-2914, 2018 WL 1413087, at *11 (S.D. Tex. Mar. 20, 2018) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982))); *Dall. Cty. v. MERSCORP, Inc.*, 11-CV-2733, 2012 WL 6208385, at *4 (N.D. Tex. Dec. 13, 2012) ("A court may strike class allegations under this rule 'where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate.'" (quoting *Aguilar v. Allstate Fire & Cas. Ins. Co.*, No. 08-4660, 2007 WL 734809, at *2 (E.D. La. Mar. 6, 2007))).

truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

To satisfy predominance, the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Ibe*, 836 F.3d at 529 (quoting FED. R. CIV. P. 23(b)(3)); *see also Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 338 (5th Cir. 2019). This "predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Ibe*, 836 F.3d at 529 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "The predominance requirement of Rule 23(b)(3), though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem*, 521 U.S. at 623–24). "Determining whether legal issues common to the class predominate . . . requires that this court inquire how the case will be tried." *Ibe*, 836 F.3d at 529. "This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'" *Id.* (quoting *O'Sullivan*, 319 F.3d at 738). "In order to predominate, common issues must constitute a significant part of the individual cases." *Id.* (quoting *Mullen*, 186 F.3d at 626).

Sig Sauer asks the court to strike the putative class definitions from the amended complaint because they are too broad to meet the Rule 23(a)(2) commonality and the Rule 23(b)(3) predominance requirements. (Docket Entry No. 35 at 23–24). Sig Sauer points out that the common-law fraud and Texas Deceptive Trade Practices Act claims require proof of individual

reliance, and that state law varies as to the express and implied warranty claims and unjust enrichment claims.  Because Gordon estimates that there are "approximately 500,000 defective P320 pistols in circulation," and the putative classes would be large and encompass P320 owners across Texas and the nation, Sig Sauer's arguments have force.  (Docket Entry No. 34 at 2).  While the class scope as to purchase date, subsequent sale, and Voluntary Upgrade Program participation can be addressed at class certification, some of Gordon's claims on behalf of the putative Texas and nationwide classes are properly stricken as improper for class certification, even at this early stage.

Gordon asserts common-law fraud claims on behalf of the putative Texas and nationwide class members.  "[A] fraud class action cannot be certified when individual reliance will be an issue."  *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 415 (5th Cir. 2017) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)); *see also* Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 793 (2013) ("Many courts have adopted essentially a *per se* view that fraud suits involving questions of individual reliance are not suitable for class certification," and the Fifth Circuit has adopted this view).  "'[T]he economies ordinarily associated with the class action device' are defeated where plaintiffs are required to bring forth individual proof of reliance."  *Cole*, 484 F.3d at 727 (quoting *Patterson v. Mobil Oil Co.*, 241 F.3d 417, 419 (5th Cir. 2001)).

The fraud claims asserted for the putative Texas and nationwide class members would require resolving whether each class member, when purchasing a P320, relied on the statements made during the "Safety Without Compromise" marketing campaign in deciding to purchase their P320 pistols.  The Fifth Circuit has held that individual reliance claims defeat Rule 23(b)(3) class certification.  Gordon has not alleged facts supporting, nor has he argued in his briefs, that there is

"a common inference of reliance based on th[e] alleged misrepresentation[s]," *Torres*, 838 F.3d at 641, or any basis to find a market presumption of reliance.  The common-law fraud claims as to the Texas and nationwide classes are stricken.  Gordon may assert his own fraud claims, but not on behalf of a class.

Gordon's Texas Deceptive Trade Practices Act claim based on false or misleading statements suffers from the same problem.  The Texas Deceptive Trade Practices Act requires a plaintiff to prove detrimental reliance on the alleged false or misleading statement.  *See Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 387 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("[A] consumer may bring an action when he has relied to his detriment on a false or misleading representation." (quotation omitted)); *Daugherty v. Jacobs*, 187 S.W.3d 607, 615 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("The plaintiff must . . . show he detrimentally relied on the deceptive act.").  Again, Gordon's theory that Sig Saur made misrepresentations associated with the "Safety Without Compromise" advertising campaign would require an inquiry into whether each putative class member, when purchasing a P320, relied on statements made during that campaign, or on other marketing materials.  This makes the Texas Deceptive Trade Practices Act claim of false or misleading statements ill-suited for class treatment. *See, e.g.*, *Henry v. Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693–94 (Tex. 2002) ("[R]eliance is an element of" a Texas Deceptive Trade Practices Act claim and the plaintiffs "failed to show that individual issues of reliance do not preclude the necessary finding of predominance").  The Texas Deceptive Trade Practices Act claim based on false or misleading statements is stricken as to the putative Texas class members.

"In a diversity class action, as is the case here, inherent in the predominance inquiry is a determination of which states' substantive laws will apply to the claims" because "the variations

41

may impact whether common issues of law and fact predominate among the class members." *Cole*, 484 F.3d at 724. "The party seeking certification of a nationwide class must therefore 'provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles.'" *Id.* (quoting *Spence v. Glock, Ges.m.b.H*, 227 F.3d 308, 313 (5th Cir. 2000)).

The Fifth Circuit has declined to certify state-law express and implied warranty claims for a nationwide class because the claim elements and defenses differ by state and the class members do not share common legal and factual issues. *See id.* at 724–29. As to express warranty claims, "[t]here is a clear split of authority among the jurisdictions as to whether a buyer must show reliance on a statement or representation for it to be considered part of the 'basis of the bargain.'" *Id.* at 726 (citing BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT WARRANTIES § 4:16 (2d ed. 2002)). Many states require notice before a plaintiff may sue for any warranty breach, and "[s]tate law varies on what constitutes reasonable notice and to whom notice should be given." *Id.* at 727. "There is a 'sharp split of authority' as to whether a purchaser may recover economic loss from a remote manufacturer when there is not privity of contract between the parties." *Id.* at 727–28 (quoting CLARK AND SMITH, THE LAW OF PRODUCT WARRANTIES § 10:20). And while some states require a defect to manifest for a plaintiff to recover for economic loss, others do not. *Id.* at 729.

Sig Sauer has submitted a 50-state survey showing the elements, requirements, and defenses associated with unjust enrichment in each state. (Docket Entry No. 35-3); *see BioPay*, 541 F.3d at 327 ("[T]he 'predominance of individual issues necessary to decide an affirmative defense may preclude class certification.'" (quoting *In re Monumental Life Ins. Co.*, 84 F.3d 734, 744 (5th Cir. 2004))). Based on this survey, Sig Sauer argues that unjust enrichment claims are improper as to the putative nationwide class because:

42

state laws regarding unjust enrichment significantly differ in terms of (1) whether the claim exists as an independent cause of action, (2) whether an inadequate remedy at law must be shown, (3) whether the benefit obtained must have been done so at the direct expense of the plaintiff, (4) the level of misconduct that must be proven, (5) the scope of the statute of limitations, (6) the accrual of the statute of limitations, and (7) availability of defenses such as laches and unclean hands.

(Docket Entry No. 35 at 25–26).

Gordon's response to all these state-law variations is that "courts regularly certify multistate and nationwide classes even when varying state laws are at issue." (Docket Entry No. 37 at 19). Because Gordon has not "adequately address[ed], much less extensively analyze[d], the variations in state law," the court is "not in a position to determine that questions of law and fact common to the members of the class predominate in the vacuum created by plaintiffs' omission." *Cole*, 484 F.3d at 730 (quotation omitted); *see Spence*, 227 F.3d at 310–11 ("[C]lass action plaintiffs must provide an 'extensive analysis' of state law variations to reveal whether these pose 'insuperable obstacles' to certification." (quoting *Walsh*, 807 F.2d at 1017)).

The express and implied warranty claims, and the Texas Deceptive Trade Practices Act claims based on the alleged warranty breach, are dismissed as to the putative nationwide class. Because the Texas law warranty claims have been dismissed, the Magnuson-Moss warranty claims are stricken as to the putative nationwide class. The unjust enrichment claims are also stricken as to the putative nationwide class. The dismissal is without prejudice and with leave to amend. Gordon may replead these claims to account for the choice-of-law problems, and Sig Sauer may reassert its arguments on another motion to dismiss or strike to deny certification.[12]

---

[12] The parties have not briefed or addressed whether the Texas Deceptive Trade Practices Act claim based on unconscionable conduct is proper for class certification, but courts have found that the individualized inquiries associated with unconscionability claims preclude certification. *See, e.g.*, *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 803–04 (S.D. Tex. 2014) ("It is not surprising, then, given the . . . importance to an unconscionability claim of plaintiff-specific details, that courts frequently deny certification of unconscionability class actions.").

III.   **Conclusion**

The motions to dismiss for lack of subject-matter jurisdiction and lack of personal jurisdiction are denied.  (Docket Entry  No. 35).  Sig Sauer's motion to dismiss is granted in part and denied in part.  (*Id.*).  The court grants the motion to dismiss as to:

- the claim for written warranty breach under the Magnuson-Moss Warranty Act, without prejudice and with leave to amend;

- the express-warranty claim under Texas law, without prejudice and with leave to amend;

- the fraudulent-concealment claim, with prejudice and without leave to amend;

- the fraud-by-misrepresentation and concealment claims, without prejudice and with leave to amend;

- the Texas Deceptive Trade Practices Act claim for false, misleading, or deceptive statements, without prejudice and with leave to amend.

The court denies Sig Sauer's motion to dismiss as to:

- the implied-warranty claims under the Magnuson-Moss Warranty Act and Texas law;

- the unjust enrichment claim; and

- the Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct.

The motion to strike or dismiss some of the class allegations is granted, as follows:

- the common-law fraud claims and Texas Deceptive Trade Practices Act claims based on false and misleading statements are stricken as to the putative Texas and nationwide classes; and

- the express and implied warranty-breach claims, Magnuson-Moss Warranty Act claims based on the Texas-law warranty claims, Texas Deceptive Trade Practices Act claims based on warranty breach, and unjust enrichment claims are stricken as to the putative nationwide class.

As to Gordon, the implied warranty-breach claim, Magnuson-Moss Warranty Act claim based on implied warranty, unjust enrichment claim, and Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct remain pending.  As to the putative

Texas class, the implied-warranty claim, Magnuson-Moss Warranty Act claim based on implied warranty, Texas Deceptive Trade Practices Act claims based on warranty breach and unconscionable conduct, and the unjust enrichment claim remain pending.  As to the nationwide class, only the Texas Deceptive Trade Practices Act claim based on unconscionable conduct remains pending.  Gordon must amend his complaint no later than **October 28**, **2019**.

SIGNED on September 20, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

45