United States District Court
Southern District of Texas

**ENTERED**

April 20, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DANTE GORDON, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:19-cv-585 |
| SIG SAUER, INC., | § § | |
| Defendant. | § § § | |

**MEMORANDUM AND ORDER**

This is a putative class action involving an alleged drop-fire defect in Sig Sauer, Inc.'s SIG P320 pistol. Sig Sauer's initial motion to dismiss was granted in part and denied in part in September 2019. *Gordon v. Sig Sauer, Inc.*, No. H-19-585, 2019 WL 4572799 (S.D. Tex. Sept. 20, 2019). Following that opinion, Dante Gordon filed his Second Amended Complaint, reasserting claims for violations of the Magnuson-Moss Warranty Act, breach of an express warranty, breach of the implied warranty of merchantability, unjust enrichment, fraud by nondisclosure, fraud by misrepresentation, and unconscionable conduct under the Texas Deceptive Trade Practices Act. (Docket Entry No. 46). The complaint also splits his proposed class action into four separate subclasses: a nationwide class based on unconscionable conduct under the Texas Deceptive Trade Practices Act; an express warranty subclass covering 25 states; an implied warranty subclass covering 24 states and the District of Columbia; and a Texas subclass for all of Gordon's nonfraud claims. (*Id.* at ¶¶ 62–65).

In response, Sig Sauer timely filed its second motion to dismiss.  (Docket Entry No. 48).  It argued that Gordon lacks standing to represent consumers outside Texas; this court lacks personal jurisdiction over Sig Sauer for any claims without a connection to Texas; Gordon's Magnuson-Moss Warranty Act claim fails because Sig Sauer never made an affirmative promise of defect-free performance; Gordon's Texas-law claims lack merit because he pleaded no manifest defect; Sig Sauer had no duty to disclose the alleged defects; and Sig Sauer made no fraudulent misrepresentations in its marketing campaign. (*Id.* at 10–11).  Sig Sauer also moved to strike Gordon's proposed subclasses as overbroad, impractical, and lacking predominance.  (*Id.* at 6).

Gordon counters that many of Sig Sauer's jurisdictional arguments are premature and should be brought at the class-certification stage.  (Docket Entry No. 50 at 4).  He argues that Sig Sauer made multiple assertions of defect-free performance in its marketing materials that are actionable under the Magnuson-Moss Warranty Act.  (*Id.* at 11).  Gordon also argues that Texas law does not require a defect to manifest before bringing warranty claims, and Sig Sauer was under a duty to disclose the safety misrepresentations after its internal testing revealed the drop-fire design defect.  (*Id.* at 12–21).

Based on the motion and response, the amended pleading, and the applicable law, Sig Sauer's motion to dismiss for lack of subject-matter jurisdiction is granted to the extent that Gordon seeks to represent class members for state-law warranty claims in states other than Texas.  Sig Sauer's motion to dismiss for lack of personal jurisdiction is denied as premature.  Sig Sauer's Rule 12(b)(6) motion to dismiss is granted in part and denied in part:

- Sig Sauer's motion to dismiss Gordon's Magnuson-Moss Warranty Act claim is granted, with prejudice and without leave to amend because amendment would be futile;

- Sig Sauer's motion to dismiss Gordon's fraud-by-nondisclosure claim is granted, without prejudice and with leave to amend; and

- Sig Sauer's other motions to dismiss are denied on the present record.

Also, Sig Sauer's motion to strike Gordon's allegations of a nationwide class for an unconscionable-conduct claim under the Texas Deceptive Trade Practices Act is granted. The reasons for these rulings are set out below.

## I.   Background

The facts of this case are taken from Gordon's Second Amended Complaint and accepted as true for the purpose of Sig Sauer's motion to dismiss. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). Because the facts of this case have already been described in the earlier motion to dismiss, this section will focus on the new details alleged in the Second Amended Complaint. (Docket Entry No. 46); *see generally Gordon*, 2019 WL 4572799, at *2–4.

Sig Sauer is a Delaware corporation with its principal place of business in Portsmouth, New Hampshire. (Docket Entry No. 46 at ¶ 19). It manufactures the SIG P320 semiautomatic pistol for law-enforcement officials, the U.S. military, and civilians. (*Id.* at ¶ 3).

Dante Gordon is a Texas citizen who purchased a P320 from a retailer in 2014. (*Id.* at ¶ 13). Before this purchase, Gordon visited Sig Sauer's website, where he read that the P320 "is the most operator focused striker duty pistol on the market today," and that "the P320 provides an enhanced level of safety not found in most modern service pistols." (*Id.* at ¶ 14). Gordon watched a Sig Sauer promotional video stating that the P320 was "drop

safe," and that "[a] striker safety prevents the striker from releasing unless the trigger is pulled." (*Id.*).  Gordon also saw a statement on Sig Sauer's website that "the P320 won't fire unless you want it to." (*Id.*)  Gordon understood these claims as representations and warranties, asserting that he relied on them before he decided to buy the P320 in September 2014. (*Id.* at ¶16).  According to Gordon, he would not have bought the weapon if he knew it had a design defect that made it susceptible to drop-fire incidents.  (*Id.*).

Almost two years after Gordon bought his P320, the military discovered, through its own internal testing, that the weapon is susceptible to a drop-fire "deficiency." (*Id.* at ¶ 28).  To rectify the deficiency, Sig Sauer modified the trigger mechanism only on military-issue P320 pistols.  (*Id.* at ¶¶ 29–30).  Because Sig Sauer offered the modification only to the military, civilians replicated the drop-fire incidents with their own testing protocols, including those used by the Houston Police Department.  (*Id.* at ¶¶ 31–32).

Despite its awareness of the design defect since 2014, Sig Sauer did not implement an upgrade program for civilian pistols until 2017.  (*Id.* at ¶¶ 9, 46–47).  This upgrade program is voluntary, and Gordon has not upgraded his P320.  (*Id.* at ¶ 18, 48).  Sig Sauer did not disclose the P320's susceptibility to drop-fire incidents in its promotional material before the upgrade program, which included a statement that the weapon without the upgrade is "safe in its current condition," and reiterated that drop-related incidents "occurred in conditions that appear to be outside of normal testing protocols." (*Id.* at ¶ 59).

At least three police officers have been injured by P320 accidents after drop-fire incidents.  (*Id.* at ¶¶ 38–41).  These incidents occurred in 2017 and 2018.  (*Id.*).  But in 2017, the CEO of Sig Sauer stated that the P320 has not had any drop-related incidents in the United States commercial market.  (*Id.* at ¶ 44).

4

Based on these allegations, Gordon now asserts seven claims against Sig Sauer: violations of the Magnuson-Moss Warranty Act, breach of express warranty, breach of the implied warranty of merchantability, unjust enrichment, fraud by nondisclosure, fraud by misrepresentation, and unconscionable conduct under the Texas Deceptive Trade Practices Act. (*Id.* at ¶¶ 71–134).

Gordon also split this class action into four subclasses:

- For his unconscionable-conduct claim, Gordon seeks to represent a nationwide class of "all persons who purchased a SIG P320 semi-automatic pistol in the United States prior to January 1, 2018, in both the full-size and compact versions." (*Id.* at ¶ 62);

- For his Magnuson-Moss Warranty Act and express-warranty subclass, Gordon seeks to represent "all Class members who purchased a SIG P320 semi-automatic pistol in the states of Alaska, California, Colorado, Delaware, Iowa, Kansas, Maine, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Vermont, Virginia, Washington, West Virginia, or Wyoming prior to January 1, 2018." (*Id.* at ¶ 63);

- For his Magnuson-Moss Warranty Act and implied-warranty of merchantability subclass, Gordon seeks to represent "all Class members who purchased a SIG P320 semi-automatic pistol in Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Texas, Utah, Virginia, or Wyoming prior to January 1, 2018." (*Id.* at ¶ 64); and

- For his non-fraud claims subclass, Gordon proposes that it include "all Class members who purchased a SIG P320 semi-automatic pistol in Texas prior to January 1, 2018." (*Id.* at ¶ 65).

Sig Sauer has now filed its second motion to dismiss Gordon's claims and strike his proposed subclasses. (Docket Entry No. 48). Sig Sauer first raises jurisdictional challenges, arguing that Gordon does not have standing to create multi-state subclasses for state-law warranty claims without named plaintiffs who suffered injury in any of those states. (*Id.* at 4). Sig Sauer then argues that Gordon has failed to state a claim even under

Texas law because Gordon's P320 never experienced a drop-fire defect, his benefit-of-the-bargain damages are not compensable, his fraud-by-misrepresentation claim is based on "mere puffery," and his fraud-by-nondisclosure claim fails because Sig Sauer was under no duty to disclose its internal testing results.  (*Id.* at 11–18).  Sig Sauer also argues that Gordon's proposed subclasses should be stricken because they are overbroad, impractical, and lack the predominance required by Rule 23.  (*Id.* at 6–10).  Finally, Sig Sauer argues that it is not subject to personal jurisdiction in Texas for class members' claims with no connection to Texas.  (*Id.* at 18).

Each of these claims is addressed in detail below.

## II.    The Legal Standards

### A.    The Motion to Dismiss for Lack of Jurisdiction

"[W]hen, as here, 'a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.'"  *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209 (5th Cir. 2010) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).  A claim must be dismissed if the court lacks subject-matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  In ruling on a motion to dismiss for lack of subject-matter jurisdiction, courts may evaluate: (1) the petition alone; (2) the petition supplemented by undisputed facts evidenced in the record; or (3) the petition supplemented by undisputed facts plus the court's resolution of disputed facts.  *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).  The party invoking jurisdiction has the burden of proving it exists, by a preponderance of the evidence.  *See Three Expo Events, L.L.C. v. City of Dall.*, 907 F.3d 333, 343 (5th Cir. 2018).

**B.    The Motion to Dismiss for Lack of Personal Jurisdiction**

A federal court may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and exercising jurisdiction is consistent with due process. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009); *see Delgado v. Reef Resort Ltd.*, 364 F.3d 642, 644 (5th Cir. 2004). Because the Texas long-arm statute confers jurisdiction to the limits of due process, "the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).

Federal due process permits personal jurisdiction over a nonresident defendant with "minimum contacts" with the forum state, subject to the limit of not offending "traditional notions of fair play and substantial justice." *Id.* Under Rule 12(b)(2), "[w]hen the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a prima facie case that personal jurisdiction is proper.'" *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)). "Proof by a preponderance of the evidence is not required." *Johnston*, 523 F.3d at 609 (citing *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)). "[U]ncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists." *Id.* (quotations omitted). But the district court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

### C.      The Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a).  Claims may be dismissed under Rule 12(b)(6) if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bel Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

A court should generally give a plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice for factual pleading insufficiency, unless doing so would be futile.  *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012) ("[Rule 15(a) ] evinces a bias in favor of granting leave to amend.") (quotation omitted).

### III.     Analysis

#### A.     The Motion to Dismiss for Lack of Subject-Matter Jurisdiction

In its first motion to dismiss, Sig Sauer unsuccessfully argued that Gordon lacked standing for his claims because he had not suffered an injury-in-fact.  Sig Sauer's motion to dismiss was denied because his alleged economic harm based on the drop-fire defect conferred standing.  *Gordon*, 2019 WL 4572799, at *5–8 ("Gordon's allegation that the drop-fire defect has decreased his P320's resale value, even with the availability of the Voluntary Upgrade Program, is sufficient to allege economic loss that could be redressed by a judgment ordering compensation.").  Sig Sauer renews its standing challenge here, but it now argues that while Gordon does have individual standing to bring claims under Texas law, he lacks standing to represent unnamed plaintiffs asserting claims under other states' laws.  (Docket Entry No. 48 at 4–6).  Gordon argues that Sig Sauer's standing challenges are premature and can be addressed only if Gordon seeks to certify his class action under Rule 23.  (Docket Entry No. 50 at 3–4).  While the issue was briefly addressed in the first motion to dismiss, *see Gordon*, 2019 WL 4572799, at *8 n.2, the nationwide trends on the timing of addressing class standing and Fifth Circuit precedent suggests that this issue should be addressed before class certification.

There is a split of authority on whether class action standing issues are addressed before or during the class certification process.  *Compare In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) ("These alleged problems of standing will not arise unless class certification is granted . . . and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing."), *with In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155

(E.D. Pa. 2009) (allowing a proposed class action to proceed would allow named plaintiffs to represent the claims of parties whose injuries and modes of redress they would not share). The debate stems from two Supreme Court decisions on the Article III standing of global settlement participants, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), and *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612–13 (1997).

*Amchem* involved a nationwide global settlement of current and future asbestos-related claims.  After extensive negotiations, the parties filed a complaint, answer, proposed settlement agreement, and joint motion for conditional class certification on the same day.[1]  *Amchem*, 521 U.S. at 601–02.  Objectors challenged the district court's subject-matter jurisdiction and raised other issues under Rule 23, which the district court rejected. *Id.* at 607–08.  The Supreme Court declined to address the subject-matter jurisdiction challenge, explaining that resolution was "logically antecedent" to the Rule 23 class certification issues that resolved the case.  *Id.* at 612.  But the Court pointed out that interpreting Rule 23 could only happen within Article III's constraints.  *Id.* at 612–13.  The Supreme Court solidified this rule in *Ortiz*, explaining that when class certification issues are "logically antecedent" to Article III concerns, they may be addressed before examining Article III standing.  *Ortiz*, 527 U.S. at 831.

The Fifth Circuit has viewed *Ortiz* and *Amchem* as a "limited exception" to the general rule that Article III standing must be addressed first, since standing "determines the court's fundamental power . . . to hear the suit."  *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 & n.6 (5th Cir. 2002).  The Fifth Circuit distinguishes between standing problems for the class representative and the class—"if it is the *class representative* who

---

[1]  The Court explained that neither party ever intended to litigate this case.  *Amchem*, 521 U.S. at 601.

presents the standing problem, then *that* standing issue must be addressed first prior to deciding class certification." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020) (emphasis in original); *see also* Linda S. Mullenix, *Standing and Other Dispositive Motions After* Amchem *and* Ortiz*: The Problem of "Logically Antecedent" Inquiries*, 2004 Mich. St. L. Rev. 703, 727–28 (2004) (discussing the Fifth Circuit's interpretation of *Amchem* and *Ortiz*).

Gordon seeks to represent four subclasses.  In two of these subclasses, he seeks to represent individuals for state-law warranty claims in states where he does not allege he resides, purchased a P320, or was injured.  (Docket Entry No. 46 at ¶¶ 63–64).  Gordon himself presents the standing problem, not the unnamed class members, because no named plaintiff has suffered a redressable injury in any state other than Texas.  *See Flecha*, 946 F.3d at 769.  To the extent that Gordon seeks to assert claims under the laws of states in which he neither resides, purchased the weapon, nor suffered any injury, Sig Sauer's motion to dismiss for lack of standing is granted.  *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011) ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1325 (S.D. Fla. 2010) ("Plaintiffs may only assert a state statutory claim if a named plaintiff resides in that state."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. at 158 (plaintiffs can assert claims "in which they are located and in which they have members to whom they paid reimbursements").

Gordon also argues that he can represent multi-state classes because Texas law will apply to the entire class.  (Docket Entry No. 50 at 9 (citing *In re Hyundai & Kia Fuel Econ.*

*Litig.*, 926 F.3d 539, 561 (9th Cir. 2019) ("[A] court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class.")).  But analyzing whether Texas law applies to the putative subclass members requires a hypothetical analysis of the unnamed plaintiffs' standing, making this argument premature until the class certification stage.  *See Ortiz*, 527 U.S. at 831; *Flecha*, 946 F.3d at 769.

Gordon has standing to represent a Texas subclass for his non-fraud claims because he is a Texas resident and suffered his alleged injury in Texas.  Without named plaintiffs in any jurisdiction other than Texas, however, Gordon's multi-state warranty claims are dismissed.

**B.**      **The Motion to Dismiss for Lack of Personal Jurisdiction**

Sig Sauer also argues that this court lacks specific personal jurisdiction over the non-Texas-law claims.  (*See* Docket Entry No. 48 at 18).  Sig Sauer made this argument in its first motion to dismiss and this court found that the motion was premature, but could be raised again at the class-certification stage.  *Gordon*, 2019 WL 4572799, at *8; *see also In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) ("Absent class certification, there is no justiciable controversy between [a defendant] and the unnamed putative class members.").  The court denies Sig Sauer's motion to dismiss for lack of personal jurisdiction for any remaining non-Texas-law claims.  Sig Sauer may renew this argument if Gordon moves for class certification.

**C.**      **The Motion to Dismiss for Failure to State a Claim**

Sig Sauer also moved to dismiss Gordon's claims under Rule 12(b)(6) for failure to state a claim.  Each of Sig Sauer's arguments is addressed below.

### 1.    Magnuson-Moss Warranty Act Claims

The Magnuson-Moss Warranty Act provides a cause of action to any consumer "who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [under the Act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1).   The Act defines a "written warranty" as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time.

15 U.S.C. § 2301(6)(A).   A manufacturer's statement is a written warranty under the Act if (1) the statement relates to the nature of the material or workmanship, and (2) affirms or promises defect free performance or guarantees a specified level of performance over a specified period of time.   *Id.*

This court previously dismissed Gordon's written warranty claim under the Act because Gordon had not alleged that "he read or relied on specific marketing statements before purchasing his P320, where he read them, or that Sig Sauer made these representations before his purchase."   *Gordon*, 2019 WL 44572799, at *10.   In his Second Amended Complaint, Gordon has resolved these issues, alleging that he read on Sig Sauer's website that the P320 was "drop safe" and would not "fire unless you want it to" before deciding to purchase his P320.   (Docket Entry No. 46 at ¶ 14).   Gordon also alleges that he understood these safety claims as warranties that the P320 was properly designed and "drop safe."   (*Id.* at ¶ 15).   The Second Amended Complaint identifies the statements Gordon claims are written warranties, when he read them, and what he understood them to mean before he purchased his P320.

13

Instead of focusing on the who, what, and when of Gordon's amended claim, Sig Sauer now focuses on the content of its promotional statements, arguing that statements that the weapon is "drop safe" and will not "fire unless you want it to" are not affirmative statements of defect free performance.[2] (Docket Entry No. 48 at 10). Gordon argues that these statements by Sig Sauer are affirmative warranties of defect-free performance and are written warranties under the Act. (Docket Entry No. 50 at 11–12).

"The word 'defect' is not defined within the [Act], nor is there case law explicitly interpreting the term." *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 615 (E.D. Mich. 2017) (quoting *Larsen v. Trader Joe's Co.*, No. C 11–05188 SI, 2012 WL 5458386, at *3 (N.D. Cal. June 14, 2012). In *Trader Joe's*, the court used the dictionary definition of "defect" as "the fact of being wanting or falling short; a blemish or flaw" in its analysis. *Trader Joe's*, 2012 WL 5458386, at *3. The *Schechner* plaintiffs updated this definition to include "a shortcoming, imperfection or lack." 237 F. Supp. 3d at 615. Courts have been wary about expanding the definition of "written warranty" and have narrowly interpreted the term. *See, e.g.*, *id.* at 615 ("Whirlpool's advertisement—that the oven would self-clean in under an hour—makes no affirmative promise of defect-free performance."); *Forcellati v. Hylands, Inc.*, No. CV 12–1983–GHK (MRWx), 2015 WL 9685557, at *6 (C.D. Cal. Jan. 12, 2015) ("[G]uaranteeing that [over-the-counter cold remedies are] effective or fast-acting is not a guarantee that it will not have flaws."); *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13 Civ. 1725(LGS), 2014 WL 4054240, at *12 (S.D.N.Y. Aug. 15, 2014) ("The words '100% cotton' and a stated thread count, however, cannot constitute a written warranty under the

---

[2] Sig Sauer does not challenge that the statements made relate to the workmanship of its product.

MMWA because neither of these labels promises that the sheets are defect-free."); *In re ConAgra Foods*, 908 F. Supp. 2d 1090, 1102 (C.D. Cal. 2012) ("The statement that Wesson Oil is "100% Natural" is not an assertion that the product is defect free or that it will meet a specific level of performance over a specified period of time."); *In re Sears, Roebuck & Co.*, No. MDL–1703, 05 C 4742, 05 C 2623, 2006 WL 1443737, at *4 (N.D. Ill. May 17, 2006) (the phrase "made in USA" is a "product description that does not inform consumers that the tools are defect-free").  Given the consistent court rejection of interpreting similar statements as written warranties, Gordon's claim fails as well.

While the statements on the Sig Sauer website are not product descriptions like claims that a cooking oil is "100% natural" or that a bedspread is "100% cotton," even more specific product descriptions are not viewed as written warranties under the Act.  In *Forcellati*, the plaintiffs brought a class action lawsuit against the manufacturer of several children's homeopathic cold remedies.  *Forcellati*, 2015 WL 9685557, at *1.  The manufacturer's labels described the remedies as "fast, safe, and effective."  *Id.*  The plaintiffs alleged that the remedies were "nothing more than sweetened flavored water with . . . highly diluted concentrations of the products' so-called 'active ingredients.'"  *Id.*  The court dismissed the plaintiffs' claims, holding that describing a product as effective and fast-acting does not mean the product is free of flaws or defects.  *Id.* at *6.  A similar written-warranty claim was dismissed in *Schechner*, even though the plaintiffs alleged that an oven they bought based on an advertisement that it would self-clean in one hour could not perform that task.  *Schechner*, 237 F. Supp. 3d at 615–16.  The court characterized the advertisement "as a description of anticipated product performance," rather than an

affirmative promise of defect-free performance, finding for the defendant and dismissing the written-warranty claim.  *Id*.

Sig Sauer's claims are closer to descriptions of anticipated product performance than to affirmations of defect-free performance.  Stating that the P320 "will not fire unless you want it to" does not state that the weapon has no flaws with its firing mechanism.  *See id*; *Forcellati*, 2015 WL 9685557, at *6.  Similarly, stating that a weapon is "drop safe" describes a quality of the weapon, without affirmatively stating that the weapon is free of all defects.  *See ConAgra Foods*, 908 F. Supp. 2d at 1102.  The narrow definition of "written warranty" under the Act does not apply to the Sig Sauer marketing statements Gordon relied on.

Even if the statements do not meet the definition of a written warranty under the Act, Gordon insists that his claim survives because he still has a valid state-law claim for breach of an express warranty.  (Docket Entry No. 50 at 12).  None of the cases Gordon cites apply here.  In most of the cases cited, the parties agreed that the plaintiff's claims under the Act were inextricably linked to their state-law claims, foreclosing the court's need to address the subject in depth.  *See Clemens v. DaimlerChrystler Corp.*, 534 F.3d 1017, 1022 n.3 (9th Cir. 2008) ("Clemens alleges a violation of the Act only insofar as DaimlerChrystler may have breached its warranties under state law."); *Tobin v. Samsung Elects. Am., Inc.*, No. 18–12473, 2019 WL 1399557, at *7 (D.N.J. Mar. 27, 2019) (both parties stated that the plaintiffs' claims under the Act "stand or fall" on the claimant's express and implied warranty claims); *Morgan v. Apple Inc.*, No. 17–cv–05277–RS, 2018 WL 2234537, at *8 (N.D. Cal. 2018) ("Apple contends and plaintiffs do not dispute that the [Act] claims rise or fall with their state law warranty claims.").  The final case Gordon

cites dismisses the plaintiff's Magnuson-Moss Warranty Act claim because the plaintiff failed to allege any state-law warranty claims. *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 762 (E.D. Mich. 2017) ("Beck failed to adequately allege his state warranty claims. Thus, his [Act] claim fails, too.").

If a plaintiff fails to state a claim for breach of an implied warranty under state law, the claim will also be dismissed under the Act because it defines "implied warranty" as "an implied warranty arising under State law." 15 U.S.C. § 2301(7). On the other hand, the Act defines "written warranty" without tying the term to state law. *Id.* § 2301(6). The statute connects implied-warranty claims to state law, while limiting written-warranty claims to the narrow definition contained within the Act itself. *Cf. Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 897–98 (C.D. Cal. 2013) (underscoring the narrow definition of "written warranty" under the Act).

Whether or not Gordon's state-law express-warranty claim survives, his written-warranty claim under the Act cannot survive because the challenged Sig Sauer marketing statements are not promises of defect-free performance, but descriptions of product features that may include some defects.

### 2. The Texas Law Claims

#### i. The Manifest-Defect Requirement

In its first motion to dismiss, Sig Sauer argued that Gordon lacked standing to sue, in part because his P320 had not shown the alleged drop-fire defect. This court concluded that whether or not his weapon had experienced a drop-fire incident, Gordon had standing because the alleged decrease in the weapon's resale value is a redressable injury. *Gordon*, 2019 WL 4572799, at *7; *see also USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479,

489 (Tex. 2019) (permitting benefit-of-the-bargain damages under Texas common law); *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("[I]t is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they alleged they have suffered."). Sig Sauer now argues that even if the decrease in resale value confers standing, the lost value is not compensable because Texas law requires an alleged defect to "manifest" before a plaintiff can recover damages. (Docket Entry No. 48 at 11 (citing *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 853–60 (Tex. App.—Fort Worth 2005, no pet.)).

Gordon counters by differentiating between manufacturing defects and design defects. (*See* Docket Entry No. 50 at 12–15). He argues that the design defect present in the P320 manifests in every pistol with the defect. (*Id.*). Gordon argues that Sig Sauer's comparison to *Everett* is misplaced because the *Everett* court merely concluded that the potential for damages was too remote under the facts of that case and specifically allowed for compensable benefit-of-the-bargain damages on other facts. *Id.* at 14–15 (citing *Everett*, 178 S.W.3d at 858).

Texas "law is not well developed on the degree to which [a] defect must actually manifest itself before [a claim] is actionable." *DaimlerChrystler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). Before *Inman*, Texas courts of appeals reached conflicting results, but most held that plaintiffs could not sue for benefit-of-the-bargain damages so long as the product had not manifested the alleged defect, especially if it was a consumer product with a limited useable life. *See, e.g.*, *General Motors Corp. v. Garza*, 179 S.W.3d 76, 83 (Tex. App.—San Antonio 2005, no pet.) (denying class certification for owners who never experienced the alleged brake defect because these owners "got what they paid for—

a vehicle that provided transportation with a brake system that safely stopped the car");
*Everett*, 178 S.W.3d at 853–60 (dismissing claims for defective seatbelts when the
plaintiffs had owned the cars for ten years with no manifestation of the alleged defect);
*Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 362 (Tex. App.—Hous. [14th Dist.] 2003,
no pet.) (a claim for benefit-of-the-bargain damages "looks suspiciously like a claim for
future injury to property, which Texas has rejected"); *but see Microsoft Corp. v. Manning*,
914 S.W.2d 602, 609 (Tex. App.—Texarkana, writ dism'd) (allowing a claim for
unmanifested data-storage defects in software because software, unlike tires or cars, has an
indefinite useful life).

   *Inman* itself involved a class action over allegedly defective seatbelt buckles. 252
S.W.3d at 300. According to the plaintiffs' petition, the car manufacturer had received
only 50 complaints over 10 years, or roughly one complaint for every 200,000 owners or
leasees. *Id.* at 306. Considering the remoteness of the injury, the Texas Supreme Court
dismissed the claim. *Id.* While Texas law may not have a definitive answer on whether a
defect must manifest itself in the product for a cognizable claim for benefit-of-the-bargain
damages, the likelihood of the manifestation and the usable life of the alleged defective
product can guide a court's decision. *See id.*

   Gordon has alleged that since Sig Sauer developed the P320 in 2014, drop-fire
incidents have accounted for at least four police firearm discharges and injured three
officers. (Docket Entry No. 46 at ¶¶ 38–41). He also cites one private firearm dealer's
tests, which concluded that three out of every four P320s manifested the defect more than
half the time if dropped at a certain angle. (*Id.* at ¶ 31). Taking these allegations as true at
this early stage shows that the alleged P320 drop-fire defect has a potentially high

likelihood of manifestation and that Gordon may have a compensable claim under Texas law. *Cf. Everett*, 178 S.W.3d at 858 (focusing on the remoteness of the likely injury in granting the defendant's motion to dismiss).

Pistols, unlike most consumer products, have a long useable life. *See Manning*, 914 S.W. 2d at 609 ("Even though the defect is not manifest today . . . it may manifest itself tomorrow."). Even if the P320 did not have such a long useable life, the P320 has a documented history of drop-fire defects within three years of its release. *See Everett*, 178 S.W.3d at 856 ("[B]y performing as they were supposed to for over ten years [the seatbelts] have lived up to [a] 'minimum level of quality'") (quoting TEX. BUS. & COM. CODE § 2.314(b)(c)). Texas law rarely allows benefit-of-the-bargain damages for unmanifested product defects, but considering the potential frequency with which the alleged drop-fire defect occurs and the useable life of most pistols, Gordon's claims for compensable damages under Texas law cannot be dismissed at this stage.

## 2. Benefit-of-the-Bargain Damages as a Compensable Injury

Sig Sauer now argues that even if Gordon's claim confers standing, it cannot support a claim for recovery under Texas law. (Docket Entry No. 48 at 12–13). Sig Sauer cites two cases analyzing the insufficiency of a diminished-resale-value injury for standing from two out-of-circuit courts. *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1165 n.11 (C.D. Cal 2011); *Beyer v. Symantec Corp.*, No. 18–cv–02006–EMC, 2019 WL 935135 (N.D. Cal. Feb. 26, 2019). But under Fifth Circuit precedent and Texas law, Gordon's benefit-of-the-bargain damages are compensable and redressable. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2019); *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007); *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d

449, 455 (5th Cir. 2001).  Sig Sauer may renew this objection on summary judgment if Gordon cannot support these general allegations with specific facts based on affidavits or other evidence.  *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

### ii.    Fraud by Nondisclosure

Sig Sauer also renews its argument that it had no duty to disclose testing results because no confidential or fiduciary relationship exists between Gordon and Sig Sauer. (Docket Entry No. 48 at 14–15).  "A duty to disclose may arise (1) when there is a confidential relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure that conveys a false impression."  *Spencer & Assocs., P.C. v. Harper*, No. 01–18–00314–CV, 2019 WL 3558996, at *5 (Tex. App.—Hous. [1st Dist.] Aug. 6, 2019, no pet.).  Gordon argues that even without a fiduciary relationship, Sig Sauer had a duty to disclose drop-free defects it found during internal testing after it marketed the P320 as "drop safe."  (Docket Entry No. 50 at 19–21).

Even assuming that Sig Sauer had a duty to disclose, which is unclear based on controlling precedent,[3] Gordon's fraud claim fails because he has not pleaded facts

---

[3]  While multiple Texas Courts of Appeals have adopted the modified version of the *Restatement (Second) of Torts* § 551(2) outlined above, neither the Fifth Circuit nor the Texas Supreme Court has explicitly adopted this test. *See, e.g.*, *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220–222 (Tex. 2019) (recognizing the possibility of a duty to disclose when one party "voluntarily disclosed some information, creating a duty to disclose the whole truth"); *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565 (5th Cir. 2005) ("[N]o duty to disclose exists in Texas absent a fiduciary or confidential relationship."); *Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2001) ("The *Restatement (Second) of Torts* section 551 also recognizes a general duty to disclose facts in a commercial setting . . . . We have never adopted section 551.") (alteration in original); *see also In re General Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 453 (S.D.N.Y. 2017) ("In light of the Texas Supreme Court's decision in *Bradford* and the Fifth Circuit's pronouncement in *United Teacher*

sufficient to show that Sig Sauer knew of the P320's alleged design defect before Gordon bought his pistol in 2014.

"A seller has no duty to disclose facts he does not know." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995). Gordon's amended complaint contains a single conclusory allegation that Sig Sauer has known about the drop-fire design defect since at least 2014, when it started manufacturing the SIG P320 and conducted internal testing. (Docket Entry No. 46 at ¶ 9). But Gordon also alleges that Sig Sauer claimed that the P320 meets and exceeds the safety and testing standards of the American National Standards Institute/Sporting Arms & Ammunition Institute. (Docket Entry No. 46 at ¶¶ 58–59). Gordon does not allege when this internal testing allegedly took place in 2014, or if it occurred after Gordon bought his P320 in September 2014. Without more specificity about when and where Sig Sauer's internal testing occurred, Gordon has not pleaded enough facts to state a claim for fraud by nondisclosure. FED. R. CIV. P. 9(b). Gordon's fraud by nondisclosure claim is dismissed, without prejudice and with leave to amend.

### iii. Fraud by Misrepresentation

Sig Sauer argues that Gordon's fraud-by-misrepresentation claims fail because the promotional statements Gordon alleges are misrepresentations of material fact are "puffing" or "opinion." (Docket Entry No. 48 at 13–14). Gordon counters that Sig Sauer's claim is premature at the motion-to-dismiss stage and the statements made by Sig Sauer go beyond these levels. (Docket Entry No. 50 at 18–19).

---

*Associations*, the Court is inclined to agree with New GM that Plaintiffs' fraudulent concealment claims cannot proceed absent fiduciary or confidential relationships.").

The Texas Supreme Court defines "puffery" as "an expression of opinion by a seller not made as a representation of fact." *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729 (Tex. 1982). Marketing statements become actionable misrepresentations only when the statements are specific, detailed representations of the product that the buyer relies on in making his purchase. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 503–04 (Tex. 2001) (statements made by a seed distributor about disease resistance and quality of its sorghum seed was some evidence of an actionable misrepresentation claim under the Deceptive Trade Practices Act); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *cf. Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) (defining "puffery" under the Lanham Act to be "(1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion").

In general, allegations of puffery are addressed when a court addresses the merits of the misrepresentation claim. *See, e.g.*, *Greene v. Toyota Motor Corp.*, No. 3:11–CV–207–N, 2014 WL 12575717, at *4 (N.D. Tex. 2014) (addressing puffery defense on summary judgment); *Heard v. Monsanto Co.*, No. 07–06–0402–CV, 2008 WL 1777989, at *3–4 (Tex. App.—Amarillo 2008, no pet.) (same); *Reynolds v. Murphy* 188 S.W.3d 252, 267–72 (Tex. App.—Fort Worth 2006, pet. denied); *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 499–501 (Tex. App.—Eastland 2002, pet. denied) (same); *but see Greater Hous. Transp. Co. v. Uber Techs., Inc.*, No. 4:14–0941, 2015 WL 1034254, at *13–14 (S.D. Tex. Mar. 10, 2015) (addressing claims of puffery under the Lanham Act on defendant's motion to dismiss). The procedural limitations of a motion to dismiss mean

that neither party can support or attack the validity of the actual statements made.  FED. R. CIV. P. 12; *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) ("On a Rule 12(b)(6) motion, a district court generally must limit itself to the contents of the pleadings, including attachments thereto.'") (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

Nevertheless, some of Sig Sauer's marketing materials are sufficiently set out in the Second Amended Complaint and are too specific to be dismissed as "puffery." Statements that the P320 has "an enhanced level of safety not found in most modern service pistols" or is "drop safe" are too general to "convey any definite implications" about the weapon itself and cannot support a misrepresentation claim.  *Authohaus Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex. App.—Dall. 1990, writ denied) ("Generally, statements that compare one product to another and claim superiority are not actionable misrepresentations."); *see also Chandler*, 81 S.W.3d at 500 (general statements about a car's dual air bags did not give rise to a misrepresentation claim).

But Sig Sauer also stated that the P320 contained a "striker safety" that prevented "the striker from releasing unless the trigger is pulled."  (Docket Entry No. 46 at ¶ 5). These representations about the P320 are specific allegations about the P320's features that could support a misrepresentation claim.  *See Helena Chem.*, 47 S.W.3d at 503; *Greene*, 2014 WL 12575717, at *4 ("The alleged misrepresentations related to specific features of the 2010 Toyota 4Runner are actionable.").  Sig Sauer may renew its argument if these statements reflect the general capabilities of the P320's striker safety.  But on this record, Sig Sauer's motion to dismiss Gordon's fraud-by-misrepresentation claim is denied.

24

### D.      The Motion to Strike Class Definitions

Sig Sauer moves to strike Gordon's proposed subclass definitions as overbroad, lacking commonality, and improper for Texas Deceptive Trade Practices Act claims. (Docket Entry No. 48 at 6–10).[4]  Sig Sauer's motion to strike Gordon's remaining nationwide class is granted because of the highly individualized nature of unconscionability claims under the Texas Deceptive Trade Practices Act.

"[A] party seeking class certification under Rule 23(b)(3) must also demonstrate 'both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy.'" *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003)).  To satisfy the predominance requirement, "questions of law or fact" must "predominate over any questions affecting individual members."  *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016) (quoting FED. R. CIV. P. 23(b)(3)).  "Determining whether legal issues common to the class predominate . . . requires that this court inquire how the case will be tried."  *Id.*

Sig Sauer argues that a Texas Deceptive Trade Practices Act claim for unconscionable conduct requires a court to inquire into what each plaintiff would have done with the information allegedly withheld by the defendant.  (Docket Entry No. 48 at 7–8).  Gordon counters that his primary claim under the Deceptive Trade Practices Act is for false and misleading business practices, which are unconscionability claims that can be

---

[4]  Because Gordon does not have standing to bring claims in jurisdictions other than Texas, there is no reason to address Sig Sauer's contention that the proposed express and implied warranty subclasses are overbroad and lack commonality.

decided collectively.  (Docket Entry No. 50 at 6–8).  Gordon more generally argues that the Deceptive Trade Practices act should be liberally construed.[5]  (*Id.*).  Gordon's individual Texas Deceptive Trade Practices Act claim may be based on Sig Sauer's alleged false and misleading statements, but any class based on that claim was already stricken in Sig Sauer's first motion to dismiss.  *Gordon*, 2019 WL 4572799, at *21.  Gordon's nationwide class for unconscionable conduct under the Texas Deceptive Trade Practices Act cannot meet the predominance requirement under Rule 23.

The Texas Deceptive Trade Practices Act allows consumers to maintain a cause of action when another person uses "any unconscionable action or course" to cause economic damages.  TEX BUS. & COM. CODE § 17.50(a)(3).  The Texas Deceptive Trade Practices Act defines an "unconscionable action" as "an act or practice, which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  *Id.* at § 17.45(5).  To allege an unconscionable action, a complaint must allege facts showing "that the defendant took advantage of her lack of knowledge and 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'"  *Yates Bros. Motor Co. v. Watson*, 548 S.W.3d 662, 671 (Tex. App.—Texarkana 2018, no pet.) (quoting *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001)).  "Because the unconscionable-act-or-course-of-action element of a [Deceptive Trade Practices Act] section 17.50 unconscionability claim requires proof of each

---

[5] Gordon also argues that striking proposed definitions is premature before Gordon moves to certify his subclasses. (Docket Entry No. 50 at 4). Many cases may require some discovery to determine whether class certification is proper. *See Stewart v. Winter*, 669 F.2d 328, 331 (5th Cir. 1982); *Clements v. Trans Union, LLC*, No. 3:17–CV–00237, 2018 WL 4519196, at *6 (S.D. Tex. Aug. 29, 2018); *Lang v. DirecTV, Inc.*, 735 F. Supp. 2d 421, 439 (E.D. La. 2010). But if the proposed subclass is improper on its face it may be stricken at the motion to dismiss stage. *Gordon*, 2019 WL 4572799, at *20.

consumer's knowledge, ability, experience, or capacity, courts generally refuse to certify [Deceptive Trade Practices Act] unconscionability claims for class treatment." *Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 624 (Tex. App.—Fort Worth 2017, pet. denied); *see also McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 803–04 (S.D. Tex. 2014) ("It is not surprising, then, given the . . . importance to an unconscionability claim of plaintiff-specific details, that courts frequently deny certification of unconscionability class actions."); *Peter G. Milne, P.C. v. Ryan*, 477 S.W.3d 888, 913–14 (Tex. App.—Texarkana 2015, no pet.) (denying class certification because "determining whether [defendant's] actions were unconscionable requires evaluation of each member's individual circumstances"); *Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 244 (Tex. App.—Corpus Christi 2008, no pet.) ("Texas courts have consistently held that unconscionability claims involve highly individualized inquiries that are not appropriate for resolution by a class action."); *Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 105–06 (Tex. App.—Hous. [1st Dist.] 2004, no pet.) ("[Defendants] argue that individualized inquiries are required to answer questions of causation of damages and of the amount of damages, if any, suffered by each buyer. We agree."); *cf. Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014) (acknowledging that unconscionability under the UCC "involves a highly fact-specific inquiry into the circumstances of the bargain").

Depending on each individual plaintiff's knowledge, needs, or relative experience with firearms, the withheld information about an alleged drop-fire defect may not rise to the level of unconscionability. *See Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 624 (Tex. App.—Tyler 2000, no pet.) (acknowledging that a plaintiff with knowledge about the indirect car lending industry would not be able to show defendant acted unconscionably).

Even without these individualized inquiries, Gordon would still have to allege facts proving that each individual plaintiff relied on Sig Sauer's safety marketing material before purchasing his or her P320. The need to allege and prove these individualized facts makes Gordon's unconscionability claim unsuited for class treatment. *Gordon*, 2019 WL 4572799, at *21. Gordon may bring an individual Texas Deceptive Trade Practices Act claim based on Sig Sauer's alleged unconscionable conduct, but Sig Sauer's motion to strike his nationwide class based on the Texas Deceptive Trade Practices Act is granted.

## IV. Conclusion

Sig Sauer's motion to dismiss is granted in part and denied in part. (Docket Entry No. 48). Gordon's claims based on state-law warranty claims outside of Texas are dismissed for lack of subject-matter jurisdiction. Sig Sauer's motion to dismiss for lack of personal jurisdiction is denied as premature. Sig Sauer's motions to dismiss Gordon's Magnuson-Moss Warranty Act claim is also granted with prejudice and its motion to dismiss Gordon's fraud-by-nondisclosure claim is granted without prejudice and with leave to amend. Gordon must amend his complaint no later than **May 11, 2020.** Finally, Sig Sauer's motion to strike Gordon's nationwide class based on unconscionability under the Texas Deceptive Trade Practices Act claims is granted. Sig Sauer's remaining motions are denied.

SIGNED on April 20, 2020, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge